**SMITH COGENERATION
MANAGEMENT, INC.,
Appellant,**

v.

**The CORPORATION COMMISSION
and Public Service Company of
Oklahoma, Appellees.**

No. 78041.

Supreme Court of Oklahoma.

Nov. 16, 1993.

As Corrected Dec. 9, 1993.

S. Paul Hammons, Shelton L. Benedict, Oklahoma City, for appellant.

Jack P. Fite, Jay M. Galt, Oklahoma City, for appellee Public Service Co. of OK.

Lindil C. Fowler, Jr., Leslie Wilson Pepper, Maribeth D. Snapp, Oklahoma City, for appellee Corp. Com'n of OK.

KAUGER, Justice.

Three issues are presented:[1] 1) whether Corporation Commission Order Nos. 358343 and 358913 violate federal or state law and whether the orders are supported by substantial evidence; 2) whether the Corporation Commission has subject matter jurisdiction to review reserve margins[2] and whether it exceeded its authority in doing so; and 3) whether the Corporation Commission's Rule 58(h), codified as OAC 165:35–29–1(h),[3] is pre-empted by federal law. We find that: 1) Corporation Commission Order Nos. 358343 and 358913 do not violate federal or state law and that the orders are supported by substantial evidence; 2) The Corporation Commission has subject matter jurisdiction to review reserve margins and it did not exceed its authority in doing so; and 3) Corporation Commission Rule 58(h), codified as OAC 165:35–29–1(h), is pre-empted by the Public Utility Regulatory Policies Act of 1978. Because the Rule is pre-empted, the Corpo-

1. The appellant argues 12 separate propositions of error in their briefs, with various sub-propositions to each. After careful review of the arguments and authorities presented, it appears that these various assignments of error can be more succinctly treated in three distinct questions.

2. The reserve margin is an amount above a utility's projected power demands that a utility is required to maintain, so that if the utility should have a failure of power, it would still be able to meet its customer needs.

3. OAC 165:35–29–1(h) provides in pertinent part:

"The utility shall include in each contract with a cogenerator or small power producer the provision, and put the cogenerator and small power producer on actual notice, that the Commission may, after proper notice and hearing, change the terms and otherwise finalize experimental purchase tariffs and special contracts."

4. Public Utility Regulatory Policies Act of 1978. 16 U.S.C. § 824a–3 provides in pertinent part:

ration Commission may not require utilities and qualifying facilities to include a notice provision in approved contracts allowing reconsideration of estimated costs once a qualifying facility obligates itself to deliver power.

## FACTS

This cause concerns the proposal of Smith Cogeneration Management, Inc. (Smith/appellant), to build a cogeneration plant at the Goodyear Tire and Rubber Company facility in Lawton, Oklahoma. On August 9, 1988, Smith filed an application with the Oklahoma Corporation Commission (Corporation Commission), pursuant to the Public Utility Regulatory Policies Act of 1978 (PURPA), 16 U.S.C. §§ 796 and 824a–3 et seq.,[4] requesting that the Corporation Commission direct Public Service Company of Oklahoma (PSO/appellee),[5] to enter into negotiations with Smith regarding the proposed cogeneration plant. Smith requested that the Corporation Commission: 1) review and approve the final sales agreement; 2) mediate any disputes arising during the regulatory process; 3) determine the amount of avoided cost payments[6] that PSO would be required to pay

"(a) ... Not later than 1 year after November 9, 1978, the Commission shall prescribe, ..., such rules as it determines necessary to encourage cogeneration ..., which rules require electric utilities to offer to—
(1) sell electric energy to qualifying cogeneration facilities ... and
(2) purchase electric energy from such facilities ...
(b) ... in requiring any electric utility to offer to purchase electric energy from any qualifying cogeneration facility ..., the rates for such purchase—
(1) shall be just and reasonable to the electric consumers of the electric utility and in the public interest, and (2) shall not discriminate against qualifying cogenerators ..."

5. PSO is a wholly owned subsidiary of Central and South West Corp. (CSW).

6. 18 C.F.R. § 292.101(b)(6) provides in pertinent part:

"Avoided costs means the incremental costs to an electric utility of electric energy or capacity or both which, but for the purchase from the qualifying facility, such utility would gen-

for the power generated by the proposed project; and 4) waive its Electric Rule 58(H), codified as OAC 165:35–29–1(h),[7] precluding the Corporation Commission from reopening the terms and conditions of the power sales agreement once avoided costs were determined.

On July 12, 1990, Smith filed a Motion to Disqualify the consultants/experts hired by the Corporation Commission staff (Staff), to evaluate independently the pre-filed testimony of both Smith and PSO. The hearing officer granted the motion to disqualify on July 16, 1990. On appeal, the Corporation Commission *en banc* reversed, and it directed the hearing officer to reserve judgment on the witness' testimony until after the hearing officer had an opportunity to evaluate the existence of any bias or prejudice in favor of PSO.[8]

The hearing on the merits began on July 23, 1990. The issues tried before the hearing officer primarily concerned Smith's and PSO's proposed findings regarding PSO's present and future power needs based on PSO's ability to obtain a supply of electricity from itself, its sister companies, and other interconnected facilities and customer demands.[9] On December 31, 1990, the administrative judge issued a report partially adopting Smith's and PSO's proposed findings. The hearing officer denied Smith's claims of potential witness bias and denied PSO's proposal to prohibit Smith from filing further applications for at least four years. In addition, the hearing officer found that Rule 58(H)[10], codified as OAC 165:35–29–1(h), should be waived.

Both PSO and Smith appealed to the Corporation Commission *en banc*. On July 3, 1991, the Corporation Commission issued Order No. 358343 partially overruling the administrative judge. It found that: 1) PSO would not need any additional capacity until 1999; 2) Smith would only be able to collect avoided energy payments until 1999, based on an after-the-fact redispatch methodology, to insure that only actual costs of fuel and heat are paid; 3) because PSO's generation expansion plan was not subjected to a computer analysis incorporating the Corporation Commission's findings, another analysis should be run to insure the plan is optimal; 4) any avoided capacity payments would be calculated after December 31, 1994, if the Smith cogeneration project

---

erate itself or purchases from another source."

Avoided costs come in two varieties: avoided energy and avoided capacity costs. The summary of the final regulations found at 45 Fed. Reg. 12216 (Feb. 25, 1980) provides in pertinent part:

"... Energy costs are the variable costs associated with the production of electric energy (kilowatt-hours). They represent the cost of fuel and some operating maintenance expenses. Capacity costs are the costs associated with providing the capability to deliver energy; they consist primarily of the capital costs of facilities."

**7.** OAC 165:35–29–1(h), see note 3, supra.

**8.** Smith asserts that because two of the three expert witnesses hired by the Corporation Commission staff were former employees of two subsidiaries of PSO's parent company, Central and South West, it was error for the Corporation Commission to rely on their testimony. The administrative judge heard the witnesses' testimony and observed their demeanor while testifying and was in a better position to determine which of the witnesses were truthful, biased, prejudiced or otherwise impartial. *Webster v. Potlatch Forests, Inc.,* 68 Idaho 1, 10, 187

P.2d 527, 535 (1947); *Diaz v. United States Postal Service,* 658 F.Supp. 484, 490 (E.D.Cal.1987) (Determination of the credibility of a witness is within the discretion of presiding official who heard their testimony.); *Phelps v. Metropolitan St. Louis Sewer District,* 598 S.W.2d 163, 165 (Mo.App.1980) (Court will give deference to agency finding because agency is better able to judge demeanor and conduct of witness before it.). We have reviewed the record, including the testimony of the consultants, and are satisfied that the Corporation Commission's determination that the testimony of the consultants should be accepted on behalf of the Corporation Commission staff was not error.

**9.** PSO testified that adjustments to each of the critical factors, which affect demand for electricity, indicate that there is no need for additional capacity prior to December of 1999. The factors include: weather normalization; load management; electricity prices; air-conditioning efficiencies; economic growth; reserve margin; and expansion planning. Smith contends that PSO incorrectly evaluated the above factors and that PSO would need new capacity by 1993. The consultants insisted that PSO's calculations were the most reasonable and accurate.

**10.** OAC 165:35–29–1(h), see note 3, supra.

is on-line and delivering power by that time; 5) in the event Smith is unable to deliver power by December 31, 1994, avoided capacity costs will be reviewed by the Corporation Commission subsequent to that time; 6) under these facts, Rule 58(h) should not be waived; and 7) it would be against public policy to adopt PSO's proposition that Smith, or any other party, be prohibited from filing an application for avoided capacity payments from PSO for at least four years.

On July 15, 1991, Smith filed a motion with the Corporation Commission to reconsider and vacate. On July 29, 1991, the Corporation Commission issued Order No. 358913 (clarifying order), denying Smith's requested relief. The briefing cycle was completed on June 1, 1992, and the cause was retained by the Oklahoma Supreme Court on March 31, 1993.

## I.

### THE CORPORATION COMMISSION'S ORDER NOS. 358343 AND 358913 DO NOT VIOLATE FEDERAL OR STATE LAW AND THE ORDERS ARE SUPPORTED BY SUBSTANTIAL EVIDENCE.

 Smith attacks Order No. 358343 and Order No. 358913 on multiple grounds, the efficacy of which depends upon whether the orders are supported by substantial evidence.[11] Smith insists that pursuant to an August, 1988, proposal to deliver power

to PSO a unilateral, legally enforceable obligation arose requiring the Corporation Commission to set avoided costs for the life of the proposed agreement.[12]

The Corporation Commission staff contend that the orders are supported by substantial evidence, and that they cannot be set aside merely because the evidence is conflicting or conflicting inferences can be drawn from it. PSO argues that even if the Corporation Commission failed to set avoided costs, Smith has no legally enforceable obligation to deliver power. Both the Corporation Commission staff and PSO insist that in effect, the Corporation Commission set avoided capacity costs at $0 per kilowatt by determining that PSO did not need additional capacity until 1999.

 The determinative questions are whether the Corporation Commission adequately performed its duty under federal and state law, and whether the Corporation Commission's findings are supported by substantial evidence.[13] A presumption of correctness accompanies the Corporation Commission's findings in matters it frequently adjudicates and in which it possesses expertise.[14] The Corporation Commission has wide discretion in the performance of its duties and this Court may not substitute its judgment on disputed questions of fact unless the findings are contrary to law or unsupported by substantial evidence.[15]

In 1978, Congress enacted the Public Utility Regulatory Policies Act (PURPA),

---

11. Smith asserts that, in issuing the orders, the Corporation Commission: 1) ignored testimony that real electric prices were declining; 2) ignored evidence that air conditioning efficiency assumptions and declining electric prices would offset each other; 3) incorrectly adopted PSO's reserve margin and recommendations concerning weather normalization methodology, temporary interruptible contracts and economic growth assumptions; 4) by adopting an after-the-fact redispatch methodology, violated its own order that avoided costs would be based on PSO's and not its parent company Central and South West Electric's costs; 5) erred in finding that PSO will not need additional capacity until 1999; and 6) erred by failing to set avoided costs for the life of the proposed power sales agreement.

12. Smith contends that the majority of the Corporation Commission erroneously issued Order

Nos. 358343 and 358913 without consulting and deliberating with the dissenting Commissioner. Because Smith has not cited any authority or made an argument in support of their propositions we will not address this issue. *McDonald v. Humphries*, 810 P.2d 1262, 1264 (Okla.1990).

13. *Forest Oil Corp. v. Corp. Com'n of Oklahoma*, 807 P.2d 774, 788 (Okla.1990) (Pursuant to Okla. Const. art. 9 § 20, an order of the Corporation Commission will be affirmed if supported by substantial evidence and the law).

14. *MCI Telecommunications Corp. v. State*, 823 P.2d 351, 358 (Okla.1991); *Turpen v. Oklahoma Corp. Com'n*, 769 P.2d 1309, 1317 (Okla.1988).

15. *MCI Telecommunications Corp. v. State*, see note 14, supra; *Teleco v. Corp. Com'n* 653 P.2d 209, 212 (Okla.1982); *Bishop v. Corporation Commission*, 394 P.2d 235, 236 (Okla.1963).

16 U.S.C. §§ 796 and 824a–3 et seq., as part of a package of legislation to combat the nationwide energy crisis resulting from the quadrupling of oil prices in the early 1970s and the severe shortage of natural gas in 1977.[16] Section 210(a) of PURPA, 16 U.S.C. § 824a–3 [17] directs the Federal Energy Regulatory Commission (FERC) to promulgate rules to encourage the development of alternative sources of power, including rules requiring utilities to offer to buy electricity from, and to sell electricity to, qualifying cogeneration and small power production facilities (QFs).

In 1981, the Oklahoma Legislature, pursuant to PURPA, enacted 17 O.S. § 34.1 (1981),[18] giving the Corporation Commission the power to implement and administer PURPA. The Corporation Commission responded by promulgating Rule 58, now codified as OAC 165:35–29–1 et. seq., to implement and administer the FERC's cogeneration rules.[19]

■ Under PURPA, a qualifying facility is entitled to full avoided costs even if the costs are based on estimated future avoided costs.[20] The FERC regulations also authorize the states to grant QFs the option of obtaining rates for avoided costs calculated at the time an obligation is incurred, rather than at the time of delivery.[21] This is the option Smith chose. However, in

---

**16.** *Federal Energy Regulatory Commission v. Mississippi,* 456 U.S. 742, 745, 102 S.Ct. 2126, 2130, 72 L.Ed.2d 532, 538 (1982).

**17.** 16 U.S.C. § 824a–3, see note 4, supra.

**18.** Title 17 O.S.1981 § 34.1, provides in pertinent part:

"The Commission shall have the power to implement and administer the Public Utility Regulatory Policies Act (P.L. 95–617). The Public Utility Division of the Corporation Commission shall be responsible for assisting the Commission in the performance of these duties ...
The Corporation Commission shall adopt such rules and regulations as are necessary to implement the purpose of all federal laws which are administered or enforced by the Corporation Commission."
Section 34.1 was amended effective July 20, 1987. This statute does not alter the substance of the above quoted provision.

**19.** OAC 165:35–29–1(f) provides:

"A cogenerator or small power producer has the right:
(1) To generate in parallel with the utility.
(2) To sell, at his/her option, his/her total generation or his/her generation net of electrical requirements.
(3) To receive for his/her generation a fair rate based on the costs avoided by the utility because of his/her delivery, reliability, dispatchability and other factors, as determined by the commission.
(4) To other substantive rights granted by PURPA.
(5) To good faith negotiations by the utility.
(6) To bring complaint or dispute to the Commission for mediation, hearing or other resolution."

**20.** 18 C.F.R. § 292.304(b)(5) provides:

"In the case in which the rates for purchases are based upon estimates of avoided costs over the specific term of the contract or other legally enforceable obligation, the rates for such purchases do not violate this subpart if the rates for such purchases differ from avoided costs at the time of delivery."

**21.** 18 C.F.R. § 292.304(d) provides in pertinent part:

"Purchase 'as available' or pursuant to a legally enforceable obligation. Each qualifying facility shall have the option either: ...
(2) To provide energy or capacity pursuant to a legally enforceable obligation for the delivery of energy or capacity over a specified term, in which case the rates for such purchases shall, at the option of the qualifying facility exercised prior to the beginning of the specified term, be based on either:
(i) The avoided costs calculated at the time of delivery; or
(ii) The avoided costs calculated at the time the obligation is incurred."
The FERC's commentary in it's preamble to the regulations, 45 Fed.Reg. 12224 (Feb. 25, 1980), relating to the combined effect of § 292.304(d) and § 292.304(b)(5) provides in pertinent part:
"Paragraphs (b)(5) and (d) are intended to reconcile the requirement that the rates for purchases equal the utilities' avoided cost with the need for qualifying facilities to be able to enter into contractual commitments based, by necessity, on estimates of future avoided costs ... Paragraph (d)(2) permits a qualifying facility to enter into a contract or other legally enforceable obligation to provide energy or capacity over a specified term ... this ... enables a qualifying facility to establish a fixed contract price at the outset of its obligation or to receive the avoided costs determined at the time of delivery ... "

order for a qualifying facility to be entitled to have avoided costs set for the life of a project, based on the date of the QF's action, the cogenerator must do something more than enter into negotiations.[22]

■ Here, Smith alleged that the cogeneration plant could make power cheaper than PSO and requested, pursuant to PURPA, that PSO buy Smith's power. Smith, rejecting PSO's avoided cost calculations and alleging that PSO would not negotiate a fair avoided cost rate, asked the Corporation Commission to estimate PSO's avoided costs and set them for the duration of the proposed sales agreement. However, Smith did not present a contract which obligated it to deliver power to PSO, nor did it attempt to obtain a contract for construction, operation and maintenance of the proposed project or a contract for the purchase of natural gas.[23] Instead, Smith attempted to have estimated avoided costs

---

**22.** *A.W. Brown Co., Inc. v. Idaho Power,* 121 Idaho 812, 828 P.2d 841 (1992) (The Idaho Public Utilities commission has authority, under the PURPA and Idaho state law to establish that before a qualified facility could lock-in rates, there must be a signed contract to sell at that rate or a meritorious complaint alleging that the project was mature and that the developer had attempted and failed to negotiate a contract with the utility.); *Armco Advanced Materials v. PUC,* 135 Pa.Cmwlth. 15, 579 A.2d 1337, 1347 (1990) (A legal obligation does not exist at a time during serious negotiations between the parties, (whether at the time of agreement in principle or in price) if the QF has not yet obligated itself to deliver power and if it remains free to walk away from negotiations without liability); *Appeal of Public Service of N.H.,* 130 N.H. 285, 539 A.2d 275, 280 (1988) (In setting avoided costs, investors must be able to estimate the expected rate of return of their investment with reasonable certainty before developing a qualifying facility. Therefore, avoided costs can be set where a QF agrees to an obligation to deliver and filed a rate petition accompanied by a signed interconnection agreement.); *Snow Mountain Pine Co. v. Maudlin* 84 Or.App. 590, 734 P.2d 1366, 1371 (1987), *cert. denied* 499 U.S. 961, 111 S.Ct. 1585, 113 L.Ed.2d 650 (1991) (A QF has the power to determine the date for which avoided costs are calculated by tendering an agreement that obligates itself to provide power.)

**23.** Dr. Smith, president of Smith Cogeneration, presented the only testimony regarding any evidence of obligation on Smith's part. Smith testified that SCM would not be able to obtain construction, operation and other detailed estimates, or contracts prior to a hearing on the merits determining PSO's proper avoided costs in this cause. In determining that PSO would need no new capacity until 1999, the Corporation Commission, in effect, determined that capacity costs until that time would be $0.00 per kilowatt. The Commission Order No. 358343 provides in pertinent part:

"... the Commission has previously herein accepted PSO's load forecast which indicates no need for additional capacity until the year 1999. Accordingly, the commission finds that SCM will be entitled to receive only avoided energy payments until that time ..."

There is no evidence in the record that Smith presented a contract to PSO to obligate itself to deliver power. An estimated avoided cost rate, established for the life of a proposed contract may facilitate a cogenerator's ability to negotiate a contract to provide power to a utility, but such a policy consideration may not overcome a contrary result required by law. Whether the Corporation Commission determines avoided costs for the duration of a contract, a cogenerator is not without an estimate of a utility's actual avoided costs because the FERC regulations and Oklahoma Corporation Commission rules, require electric utilities to furnish data concerning present and future costs of energy and capacity on their system. 18 C.F.R. § 292.-302(b), see note 31, infra.

OAC 165:35–29–1(e) provides in pertinent part:

"Each utility will maintain on file for all other potential cogenerators a small power producers information sufficient to guide such parties in regard to avoided costs and procedures. Such information shall include, but not be limited to: (1) The utility's response to avoided cost interrogatories as requested by the Commission ... (4) Such reports and analyses as shall be prescribed by the Commission ..."

The preamble to the FERC regulations 45 Fed. Reg. 12215 (Feb. 1980) provides in pertinent part:

"... To enable potential cogenerators and small power producers to be able to estimate these avoided costs, the rules require electric utilities to furnish data concerning present and future costs of energy and capacity on their system. These rules also provide that electric utilities must furnish electric energy to qualifying facilities on a nondiscriminatory basis, and at a rate that is just and reasonable and in the public interest; and that they must provide certain types of service which may be requested by qualifying facilities to supplement or back up those facilities' own generation."

Because a utility is required to file cost data and projections with the state regulatory agency, the QF knows the rate which it would receive if negotiations failed—subject to the Commission's review to insure that the rate is just and reasonable, non-discriminatory, and in the public interest.

established for a 15–year contract prior to establishing a legally enforceable obligation.[24] The Corporation Commission found that Smith was entitled to avoided energy payments, but that because PSO would not need additional capacity until 1999, it would determine avoided capacity costs at a later date. Under these facts, we find nothing in PURPA which entitled Smith to have avoided costs fixed for the life of the proposed power sales agreement.[25]

■ Evidence concerning the need for additional capacity and the factors used in calculating avoided costs payments was presented by both PSO's and Smith's expert witnesses. The methodology employed by the witnesses conflicted, and their conclusions as to appropriate capacity payments differed substantially. The reports and recommendations of the hearing officer are advisory only and are not binding upon the Corporation Commission.[26] The Corporation Commission is required to reach its own conclusions upon the evidence and to make adequate findings. It may adopt or reject any or all findings or recommendations of the examining officer.

It may also expand such findings and recommendations. We have reviewed the record including the testimony of the witnesses and we are satisfied that the record adequately supports the Commission's determination that PSO would not need additional capacity until 1999.[27] Our review of PURPA and the rules enacted by FERC in furtherance of PURPA's stated purpose leads us to conclude that the Corporation Commission had ample legal support for its decision. We find no error in the Commissions review of the proposed agreement between Smith and PSO—that review furthered the federal objectives of ensuring that the rates be just and reasonable to electric consumers. The Corporation Commission followed both federal and state laws, and its own rules.

## II.

## THE CORPORATION COMMISSION HAS SUBJECT MATTER JURISDICTION TO REVIEW RESERVE MARGINS AND IT DID NOT EXCEED ITS AUTHORITY IN DOING SO.

24. PSO contends that although Smith filed a motion for relief from the Corporation Commission Order, the cogenerator never specifically advised the Corporation Commission that the order had failed to set avoided capacity payments and therefore, it failed to exhaust administrative remedies. Although exhaustion of administrative remedies is a prerequisite for resort to the courts as a general rule, remedies that are ineffective or unavailable need not be exhausted. *Lone Star Helicopters, Inc. v. State,* 800 P.2d 235, 237 (Okla.1990); *United Airlines, Inc. v. State Bd. of Equalization,* 789 P.2d 1305, 1308 (Okla.1990); *Allen v. State ex. Rel. Bd. of Trustees of Oklahoma Uniform Retirement System for Justices and Judges,* 769 P.2d 1302, 1307 (Okla. 1988). Because Smith had no legal obligation to deliver power, the Corporation Commission was not required to set avoided capacity costs for the duration of the proposed agreement and there was no longer an effective or available administrative remedy for Smith.

25. Smith contends that if the Corporation Commission is not required to set avoided costs for the life of the proposed power sales agreement, then Smith should be first in line until the Corporation Commission sets avoided capacity costs. Nothing in PURPA, the FERC regulations, or state law explicitly or implicitly autho-

rizes such a request. We believe that such a request would preclude cogenerators from competing to fulfill an electric utility's avoided energy and capacity needs. The FERC regulations do not prevent electric utilities and qualifying facilities from agreeing to a rate of purchase that differs from what is otherwise required by the regulations. 18 C.F.R. § 292.301(b)(1), see note 38, infra.

26. *State ex rel. Cartwright v. Oklahoma Natural Gas Co.,* 640 P.2d 1341, 1346 (1982).

27. The order reflects that various factors presented by both parties were of concern to the Corporation Commission. The FERC regulations require electric utilities to provide data regarding avoided costs and that the electric utility has the burden of justifying its data. 18 C.F.R. § 292.302 see note 31, infra. Both parties presented testimony unveiling concerns about the appropriate use of real electric prices, air conditioning efficiencies, reserve margin requirements, weather normalization, interruptible contacts, growth assumptions and the after-the-fact redispatch methodology proposed by PSO. The Commission found that PSO, for the most part, was justified in its use of its data. This decision is supported by the evidence in the record.

■ PSO insists that although the evidence supports the decision of the Corporation Commission, the Commission lacks subject matter jurisdiction to set reserve margins or establish capacity needs. PSO contends that the Corporation Commission exceeded its authority by requiring another analysis to be performed in the event Smith is on line and providing power by December 31, 1994. Oklahoma Gas and Electric (OG & E), *amicus curie*, and PSO find support for the proposition that because the amount of generating capacity and its associated costs is an internal management decision, the Corporation Commission lacks subject matter jurisdiction to make any determination concerning capacity relying on our decision in *Oklahoma Gas and Electric Co. v. Corporation Com'n*, 543 P.2d 546, 551 (Okla.1975).

■ In *Oklahoma Gas and Electric*, this Court held that an interpretation of 17 O.S.1971 § 152,[28] extending the power of

the Corporation Commission to control internal management, to the extent it could prohibit the construction of a proposed project would violate § 35 of the Art. 9 of the Oklahoma Constitution,[29] Here, the Corporation Commission made no attempt to control internal management of PSO. Rather, the Corporation Commission reviewed PSO's generation capacity and its associated costs only to insure that PSO's proposed factors affecting avoided costs were just and reasonable and that they did not discriminate against the cogenerator. This authority is consistent with PURPA which permits the Corporation Commission to further federal policies through the performance of functions authorized under Oklahoma statutes.[30]

The FERC regulations[31] taken together with § 34.1 and Oklahoma Corporation Commission rule OAC 165:35–29–1(f)[32] authorize the Corporation Commission[33] to

**28.** Title 17 O.S.1971 § 152, provides in pertinent part:

"The Commission shall have general supervision over all public utilities, with power to fix and establish rates and to prescribe rules, requirements and regulations affecting their services, operation, and the management and conduct of their business; shall inquire into the management of business thereof, and the method in which same is conducted ..."

**29.** Okla. Const. art 9, § 35 provides:

"After the second Monday in January, nineteen hundred and nine, the Legislature may, by law, from time to time, alter, amend revise, or repeal section from eighteen to thirty-four, inclusive, of this article, or any of them, or any amendments thereof: Provided, That no amendment made under authority of this section shall contravene the provisions of any part of this Constitution other than the said sections last above referred to or any such amendments thereof."

**30.** The United State Supreme Court has held that the federal government may constitutionally order the states to implement the FERC's regulations through State courts or agencies. *FERC v. Mississippi*, see note 16, supra, 456 U.S. at 760–61, 102 S.Ct. at 2138. Under this federal command, *states have the authority to promulgate regulations mirroring the federal regulations.* 45 Fed.Reg. 12216 (Feb. 25 1980). In general, a state may enact its own laws or regulations as long as the federal authority has not preempted all state efforts to regulate in the

area and as long as the state laws or regulations do not conflict with federal laws or regulations. *City of New York v. FCC*, 486 U.S. 57, 64, 108 S.Ct. 1637, 1642, 100 L.Ed.2d 48, 57 (1988).

**31.** 18 C.F.R. § 292.302 provides in pertinent part:

"(b) To make available data from which avoided costs may be derived ... each regulated *electric utility* ... *shall provide to its* State regulatory authority ... (2) The electric utility plans for the addition of capacity by amount and type ... (3) the estimated costs at completion of the planned capacity additions and planned capacity purchases ...
(d) ... any state regulatory authority may require (with respect to any electric utility over which it has rate making authority) ... data different than those which are otherwise required by this section if it determines that avoided costs can be derived from such data.
(e)(1) any data submitted by an electric utility under this section shall be subject to review by the state regulatory authority which has ratemaking authority over such electric utility.
(2) In any such review, the electric utility has the burden of coming forward with justification for its data."

**32.** OAC 165:35–29–1(f) see note 19, supra.

**33.** Similarly, in *Public Service Co. of Oklahoma v. Corp. Com'n*, 688 P.2d 1274, 1280 (Okla.1983), we held that Title 17 O.S. § 34.1 taken together with PURPA authorized the Corporation Com-

review capacity expansion and its associate costs for the purpose of determining whether rates paid by utilities to cogenerators are just, reasonable, and non-discriminatory.[34] Because the Corporation Commission, under Oklahoma law, has subject matter jurisdiction to review reserve margins to determine whether a utility's proposed avoided costs rates are reasonable, it did not exceed its authority in doing so.

## III.

## CORPORATION COMMISSION RULE 58(h), CODIFIED AS OAC 165:35–29–1(h), IS PRE–EMPTED BY THE PUBLIC UTILITY REGULATORY POLICIES ACT OF 1978. BECAUSE THE RULE IS PRE–EMPTED, THE CORPORATION COMMISSION MAY NOT REQUIRE UTILITIES AND QUALIFYING FACILITIES TO INCLUDE A NOTICE PROVISION IN APPROVED CONTRACTS ALLOWING RECONSIDERATION OF ESTIMATED AVOIDED COSTS ONCE A QUALIFYING FACILITY OBLIGATES ITSELF TO DELIVER POWER.

Smith asserts that because Corporation Commission Rule 58(h) directly conflicts with PURPA and FERC regulations, it discourages cogeneration and that it is preempted by federal law.[35] Smith insists that while states have broad authority to implement PURPA, any utility-type regulation over cogeneration contracts directly conflicts with the Act.

PSO contends that Rule 58(h) is required by state and federal law. PSO insists that under 17 O.S.1991 § 263,[36] the Oklahoma Legislature mandates that the Corporation Commission conduct a detailed rate investigation every five years of all electric utilities, and that Rule 58(h) is a necessary tool to accomplish this mandate. PSO finds support for the proposition that federal law requires continuous jurisdiction over qualifying facilities and that a waiver of such jurisdiction would infringe on the rights of its customers in the FERC regulations, specifically, 18 C.F.R. § 292.304(f)(4)[37] and its

mission to determine and award attorney fees once it adopted the proper procedure.

**34.** Although nothing in the PURPA, the FERC's regulations or state law explicitly states that state regulatory authorities may require additional analysis once both parties present their estimates of avoided costs, this is arguably a necessary and proper power implemented by the statutory and regulatory scheme. Such a finding is necessary for the purpose of determining avoided capacity costs, if only because the future need for capacity will determine the total amount of capacity charges that can be approved. If a state regulatory authority was required to use avoided costs based on the stated intent of a utility, it would be held captive to that utility's chosen method of meeting its future capacity needs, even if that method was inefficient or intentionally was chosen to lower the capacity costs payable to QFs. *Consumer Power Co. v. PSC*, 189 Mich.App. 151, 472 N.W.2d 77, 82 (1991). Because we have determined that the Corporation Commission acted under the authority of § 34.1 and did not invade the prerogative of internal management we need not determine whether the PURPA expands subject matter jurisdiction of the Corporation Commission and whether such expansion would violate the Tenth Amendment of the United States Constitution.

**35.** Rule 58(h) requires utilities and cogenerators to include in each contract a notice provision

that allows the Corporation Commission to change the terms and otherwise finalize experimental purchase tariffs of a power sales agreement throughout the duration of the contract. Rule 58(h), codified as OAC 165:35–29–1(h), see note 19, supra. If an entrepreneur can show inability to finance without a firm contract, the Commission will waive its rule authorizing cogeneration contract review. Thus, rates for cogenerated electricity will be fixed by contract without regard to changes in the future. Stewart, "The Law of Cogeneration in Oklahoma," 118 Pub.Util.Fort. 26 (1986). Smith argues that any attempt to revisit a cogeneration contract, as a result of changed circumstances, deprives QFs the benefits of the commitment and that Rule 58(h), unless waived, stands as a direct obstacle to obtain the necessary financing for a project.

**36.** Title 17 O.S.1991 § 263 provides in pertinent part:

"In order to assure that the rates charged to their customers by public utilities and electric distribution cooperatives which utilize fuel adjustment clauses or purchased power adjustment clauses are just and reasonable, the commission shall periodically conduct detailed rate investigations of such utilities and cooperatives ... such investigations shall be conducted at least every five (5) years ..."

**37.** 18 C.F.R. § 292.304(f) provides:

preamble, 45 Fed.Reg. 12233 (Feb. 25, 1980).[38] Both PSO and the Corporation Commission staff argue that Rule 58(h) ensures that rates are just and reasonable for the duration of a long term contract, and that the rule places cogenerators on notice that contracts are subject to review and change, ensuring conformity to federal statutory requirements. The Corporation Commission staff also insists that because FERC had an opportunity to decide whether Rule 58(h) violates PURPA and declined to address the issue, the rule is in accordance with PURPA and with FERC regulations.[39]

⬛ PSO's reliance on 17 O.S.1991 § 263 and 18 C.F.R. § 292.304(f)(4) is misplaced. Whether a cogeneration contract contains a Rule 58(h) clause does not prevent the Corporation Commission from investigating utility rates under § 263. **The rate investigations to which the bill refers are to determine the rate charged to the customer by the utility, not the rate charged to the utility by the cogenerator.** Nothing in § 292.304(f) of the FERC regulations authorizes or encourages a recalculation of estimated avoided costs.[40] Instead, § 292.304(f) provides a relief mechanism for electric utilities, once an obligation

> "Periods, during which purchases not required. (1) Any electric utility which gives notice pursuant to paragraph (f)(2) of this section will not be required to purchase electric energy or capacity during any period during which, due to operational circumstances, purchases from qualifying facilities will result in costs greater than those which the utility would incur if it did not make such purchases, but instead generated an equivalent amount of energy itself. (2) Any electric utility seeking to invoke paragraph (f)(1) of this section must notify, in accordance with applicable State law or regulation, each affected qualifying facility to cease the delivery of energy or capacity to the electric utility ... (4) A claim by an electric utility that such a period has occurred or will occur is subject to such verification by its State regulatory authority as the State regulatory authority determines necessary or appropriate, either before or after the occurrence."

The preamble to the regulations 45 Fed.Reg. 12228 (Feb. 1980) provides in pertinent part: "The Commission does not intend that this paragraph [§ 304(f)] override contractual or other legally enforceable obligations incurred by the electric utility to purchase from a qualifying facility. In such arrangements, the established rate is based on the recognition that the value of the purchase will vary with the changes in the utility's operating costs. These variations ordinarily are taken into account, and the resulting rate represents the average value of the purchase over the duration of the obligation. The occurrence of such periods may similarly be taken into account in determining rates for purchases."

**38.** 45 Fed.Reg. 12233 (Feb. 25, 1980) provides in pertinent part:
> "Some commenters indicated that § 292.-301(b)(1) might be interpreted as prohibiting a State from reviewing contracts for purchases. These commenters state that, as part of a State's regulation of electric utilities, a State regulatory authority needs to be able to re-

view contracts entered into by electric utilities it regulates.
These rules, and the exemptions being provided by these rules, are not intended to divest a State regulatory agency of its authority under State law to review contracts for purchases as part of its regulation of electric utilities. Such authority may continue to be exercised if consistent with the terms, policies and practices under sections 210 and 201 of PURPA and this Commission's implementing regulations. If the authority or its exercise is in conflict with these sections of PURPA or the Commission's regulations thereunder, the State must yield to the Federal requirements."

18 C.F.R. § 292.301(b) provides:
> "Negotiated rates or terms. Nothing in this subpart:
> (1) Limits the authority of any electric utility or any qualifying facility to agree to a rate for any purchase, or terms or conditions relating to any purchase, which differ from the rate or terms or conditions which would otherwise be required by this subpart; or
> (2) Affects the validity of any contract entered into between a qualifying facility and an electric utility for any purchase."

**39.** *Applied Energy Servs. v. Oklahoma Corporation Commission,* 31 FERC ¶ 61,313 (June 3, 1985). The FERC's decision not to address the issue of whether Rule 58(h) violated PURPA carries no implication or inference that the rule is in accord with the PURPA or the FERC regulations. This is analogous to the well established denial of certiorari carrying no implication or inference. *United States v. Kras,* 409 U.S. 434, 443, 93 S.Ct. 631, 637, 34 L.Ed.2d 626, 634 (1973); See also *United States v. Mitchell,* 783 F.2d 971, 977 (10th Cir.1986), *cert. denied* 479 U.S. 860, 107 S.Ct. 208, 93 L.Ed.2d 138 (recognizing no precedential conclusion can be drawn from the denial of certiorari or the statements made by the dissenting justices.).

**40.** 18 C.F.R. § 292.304(f), see note 19, supra.

to deliver power has incurred, to prevent qualified facilities from delivering power during light load periods. This prevents an electric utility from incurring greater costs than it would have incurred had it not purchased energy or capacity from the qualifying facility.[41]

 The pre-emption doctrine stems from the Supremacy Clause of the United States Constitution [42] and it invalidates any state law which contradicts or interferes with an act of Congress.[43] Generally, pre-exemption is a matter of congressional intent which occurs under four instances: 1) express statutory language; 2) a pervasive regulatory scheme which infers by its presence that the congressional intent was that the federal regulation did not need supplemental state law provisions; 3) an actual conflict between state and federal laws making it impossible to comply with both; or 4) where the objectives and purposes of Congress are thwarted by state law.[44]

 Corporation Commission rules have the full force and effect of law.[45] A federal agency acting within the scope of its congressionally delegated authority may pre-empt state regulation and render unenforceable state or local laws which are otherwise not inconsistent with federal law.[46] The pre-emption doctrine requires us to examine congressional intent.[47] A pre-emptive regulation's force does not depend on express congressional authorization to displace a state law.[48] PURPA was enacted to encourage utility companies to purchase energy from qualifying cogeneration facilities. A cogenerator is entitled to negotiate a long-term purchase contract with established full avoided costs, even if those costs are based on future estimates.[49]

 We noted earlier that avoided costs can be calculated at the time of delivery or at the time the obligation is incurred.[50] If a cogenerator chooses the latter method of calculation, as did Smith, it has the right to receive the benefits of the contract even if, due to changed circumstances, the contract price for the power at the time of delivery is unfavorable to the utility.[51] Recently, this Court, in *Wilson v. Harlow* (1993), 860 P.2d 793, 799 (1993),[52] recognized that cogeneration regulations might require results which are unfavorable to a utility's ratepayer. In *Wilson*, the plaintiff sued the Board of Directors of OG & E, alleging that they breached a common law fiduciary duty to the ratepayer by failing to rescind a power sales agreement that was no longer feasible. We held that, under the facts, Oklahoma did not recognize a common law fiduciary duty. To hold the Board of Directors of OG & E to such a duty would

---

41. Full procedural rights are still required under this section. PSO contends that without Rule 58(h), it will be unable to obtain an orderly proceeding under this section. The Corporation Commission must act in conformance with some regular method of procedure to afford basic protection for elemental procedural rights. *Haplin v. Corporation Com'n*, 575 P.2d 109, 111–12 (Okla.1977).

42. U.S. Const. art. 6, cl. 2 provides in pertinent part:

 "This Constitution, and the laws of the United States which shall be made in pursuance thereof ... shall be the supreme law of the land ... anything in the Constitution or laws of any state to the contrary notwithstanding."

43. *Missouri–Kansas–Texas R. Co. v. State*, 712 P.2d 40, 47 (Okla.1985).

44. *Todd v. Frank's Tong Service, Inc.*, 784 P.2d 47, 49 (Okla.1989); *Missouri–Kansas–Texas R. Co. v. State*, see note 43, supra.

45. *Forest Oil Corp. v. Corporation Com'n of Oklahoma*, 807 P.2d 774, 787 (Okla.1990).

46. *City of New York v. F.C.C.*, see note 30, supra; See also *Fidelity Federal, Sav. & Loan Ass'n v. De La Cuesta*, 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664, 675 (1982) (Federal regulations have no less pre-emptive effect than federal statutes.)

47. *Fidelity Federal, Sav. & Loan Ass'n v. De La Cuesta* see note 46, supra.

48. *Id.* at 154, 102 S.Ct. at 3023.

49. 18 C.F.R. § 292.304 et seq. see notes 20, 21, 37, supra.

50. 18 C.F.R. § 292.304(d), see note 21, supra.

51. 18 C.F.R. § 292.304(b)(5), see note 20, supra.

52. Rehearing has been denied but mandate is still to issue.

conflict with PURPA and FERC regulations because the Directors could not comply with federal mandates to honor long term contracts and at the same time rescind the contracts if they became undesirable to ratepayer.

In discussing federal pre-emption, in *Wilson*, we stated that:

> "A cogenerator is entitled to receive for its electricity the utility's 'full avoided cost' ... By setting the rate at full avoided cost, FERC recognized that a utility's ratepayer might not receive a direct economic benefit from the utilization of cogenerated energy. Rather, 'ratepayer and the nation as a whole will benefit from the decreased reliance on scarce fossil fuels, such as oil and gas, and the more efficient use of energy' [53]
> ...
>
> FERC regulations also grant cogenerators the right to negotiate a long-term purchase contract with the price of power to be purchased based on the avoided costs of the utility calculated at the time of delivery or at the time the obligation is incurred. Should a cogenerator choose the latter method of calculation, it has the right to receive the benefits of the contract even if, due to changed circumstances, the contract price for the power at the time of delivery is unfavorable to the utility. FERC recognized that such regulations might result in a 'purchasing utility ... be[ing] required to pay a rate for purchases that would subsidize the [cogenerator] at the expense of the utility's other ratepayer. However, FERC concluded that this was appropriate in order 'to ensure that a [cogenerator] which has obtained the certainty of an arrangement is not deprived of the benefits of its commitment as a result of changed circumstances.' " [54]

FERC recognized, in its preamble to the regulations that this requirement could subsidize qualifying facilities at the expense of the utility's other ratepayer—45 Fed.Reg. 12224 (Feb. 25, 1980) provides in pertinent part:

> "... The Commission recognizes this possibility, but is cognizant that in other cases, the required rate will turn out to be lower than the avoided costs at the time of purchase. The Commission does not believe that the reference in the statute to incremental cost of alternative energy was intended to require a minute-by-minute evaluation of costs which would be checked against rates established in long term contracts between qualifying facilities and electric utilities ... The import of this section is to ensure that a qualifying facility which has obtained the certainty of an arrangement is not deprived of the benefits of its commitment as a result of changed circumstances. This provision can also work to preserve the bargain entered into by the electric utility; should the actual avoided cost be higher than those contracted for, the electric utility is nevertheless entitled to retain the benefit of its contracted for or otherwise legally enforceable, lower price for purchases from the qualifying facility. This subparagraph will thus ensure the certainty of rates for purchases from a qualifying facility which enters into a commitment to deliver energy or capacity to a utility."

Reconsideration of long-term contracts with established estimated avoided costs imposes utility-type regulation over QFs. PURPA and FERC regulations seek to prevent reconsideration of such contracts.

---

**53.** *Amer. Paper Inst., Inc. v. Amer. Elec. Power Serv. Corp.,* 461 U.S. 402, 406, 103 S.Ct. 1921, 1924–25, 76 L.Ed.2d 22 (1983) quoting from 45 Fed.Reg. 12222 (1980) which provides in pertinent part:
"In most instances, if part of the savings from cogeneration and small power production were allocated among the utilities' ratepayer, any rate reductions will be insignificant for any individual customer. On the other hand, if these savings are allocated to the relatively small class of qualifying cognerators they may provide a significant incentive for a high growth rate of these technologies."

**54.** Under certain circumstances, a state can set rates that are lower than full avoided costs. 18 CFR § 292.304(b)(3). Also, a QF and a utility can negotiate for lower rates, § 292.301(b)(1), see note 38, supra and a state regulatory authority or any non-regulated utility may apply to the FERC for a waiver, § 292.403.

The legislative history behind PURPA confirms that Congress did not intend to impose traditional utility-type ratemaking concepts on sales by qualifying facilities to utilities.[55] The Conference report, H.R.Conf.Rep. No. 95–1750, pp. at 97–98, U.S.Code Cong. & Admin.News 1978, pp. 7659, 7831–32 (1978), provides in pertinent part:

"It is not the intention of the conferees that cogenerators and small power producers become subject, by virtue of this language, and the rules promulgated under this section, to the type of examination that is traditionally given to electric utility rate applications to determine what is the just and reasonable rate that they should receive for their electric power. The conferees recognize that cogenerators and small power producers are different from electric utilities, not being guaranteed a rate of return of their activities generally or on the activities vis a vis the sale of power to the utility and whose risk in proceeding forward in the cogeneration or small power production enterprise is not guaranteed to be recoverable.

The conferees wish to make clear that cogeneration is to be encouraged under this section and therefore the examination of the level of rates which would apply to the purchase by the utility of the cogenerator's or small power producer's power should not be burdened by the same examination as are utility rate applications, but rather in a less burdensome manner. The establishment of utility type regulation over them would act as a significant disincentive to firms interested in cogeneration and small power production.

... The conferees do not intend cogenerators or small power producers to be subject, under the commission's rules, to utility-type regulation."

State law to the extent it thwarts the objective of Congress is pre-empted by federal law.[56] Our conclusion is based primarily upon the plain language of PURPA and the FERC's interpretation of its own regulations. Requiring QFs and electric utilities to include a notice provision allowing reconsideration of established avoided costs conflicts with PURPA and FERC regulations. Such a requirement makes it impossible to comply with PURPA and FERC regulations requiring established rate certainty for the duration of long term contracts for qualifying facilities that have incurred an obligation to deliver power. Under the facts, Smith attempted to have estimated avoided costs established for a 15–year contract prior to establishing a legally enforceable obligation. Therefore, Smith is not entitled to have avoided costs fixed for the life of the proposed power sales agreement. When Smith presents PSO with a contract legally obligating the cogenerator to deliver power to PSO, then the Corporation Commission is required to set avoided costs for the duration of the proposed contract— even if the avoided costs are estimated. Once avoided costs are set, the Corporation Commission cannot later review the contract to reconsider the avoided costs. To the extent that Rule 58(h) prevents cogenerators from obtaining the necessary financing to develop a facility, the rule stands as an obstacle to the accomplishment of PURPA and FERC regulations.[57] Accordingly, Rule 58(h) is preempted by PURPA and FERC regulations.[58]

## CONCLUSION

The Public Utility Regulatory Policies Act of 1978 was enacted to encourage cogeneration. Under the Act, a qualifying facility is entitled to full avoided costs set for the duration of a long term contract, even if the costs are based upon estimated

---

**55.** *Amer. Paper Inst. v. Amer. Elec. Pow. Serv. Corp.,* see note 53, supra at 413–16, 103 S.Ct. at 1928–29.

**56.** *Wilson v. Harlow,* (1993), 860 P.2d 793, —— (1993); *Todd v. Frank's Tong Service, Inc.,* see note 44, supra; *Missouri–Kansas–Texas R. Co. v. State,* see note 43, supra.

**57.** See discussion note 35, supra.

**58.** Because we have determined that Rule 58(h) is preempted, we need not determine whether substantial evidence exists to support a waiver of the rule under these facts.

future costs. Because avoided costs do not have to be set until the qualifying facility has established a legally enforceable obligation to deliver power to an electric utility, the Corporation Commission complied with federal and state law, in so far as it did not set avoided costs for the duration of the contact.

PURPA and FERC regulations seek to prevent reconsideration of long term contracts once estimated avoided costs are agreed upon. The Corporation Commission rules, to the extent which they require qualifying facilities and electric utilities to include a notice provision allowing reconsideration of avoided costs after the contract is agreed upon, are pre-empted by federal law. Because the Corporation Commission has subject matter jurisdiction to review reserve margins to determine whether a utilities' proposed avoided costs rates are reasonable, it did not exceed its authority in doing so. Viewed in its totality, substantial evidence exists to support Corporation Commission Orders No. 358343 and 358913.

The Corporation Commission can review PSO's avoided costs. However, it does not have to set estimated avoided costs until Smith presents a contract legally obligating itself to sell power to PSO. Once Smith is legally obligated to deliver power then the Corporation Commission is required to set avoided costs for the duration of the proposed contract.

**CORPORATION COMMISSION ORDERS AFFIRMED IN PART; REVERSED IN PART.**

HARGRAVE, OPALA, ALMA WILSON, SUMMERS and WATT, JJ., concur.

HODGES, C.J., LAVENDER, V.C.J., and SIMMS, J., concur in parts I & II, dissent from part III.