PUBLIC SERVICE COMPANY OF
OKLAHOMA, Appellant,

v.

STATE of Oklahoma, ex rel., CORPORA-
TION COMMISSION, ex rel., Susan
LOVING, Attorney General of the State
of Oklahoma, Appellees.

No. 81518.

Supreme Court of Oklahoma.

March 19, 1996.

Rehearing Denied July 3, 1996.

SUMMERS, Justice.

734

Jay M. Galt, Robert V. Varnum, and Marjorie McCullough, White, Coffey, Galt & Fite, Oklahoma City, for Public Service Company of Oklahoma.

Michael J. Hunter, Leslie Wilson Pepper, Maribeth D. Snapp, Michelle O'Neill Craig, and Kent Douglas Talbot, Oklahoma City, for Oklahoma Corporation Commission.

Larry Derryberry and Patrick D. Shore, Derryberry, Quigley, Parrish, Solomon and Blankenship, Oklahoma City, for Oklahoma Association of Electric Cooperative.

Susan Loving, Drew Edmondson, Oklahoma Attorney General's Office, Oklahoma City, Oklahoma.

Jeff F. Raley and Anita K. Anthony, Norman, for amici curiae City of Norman, Oklahoma, a Municipal Corporation.

David H. Sanders, Tulsa, for amici curiae Lakeside State Bank of Oologah and Jack Griffith Petroleum Products, Inc.

1. The parties refer to OAC 165:35-1-2 and 165:35-11-3 as Rule 60. For the sake of conve-

This is an appeal by Public Service Company of Oklahoma from a rule change by the Corporation Commission. PSO filed a motion to stay the effect of the amended rule pending appeal and a motion to retain. Both were granted by this Court. A motion to strike PSO's brief was filed. We denied the motion to strike, but directed PSO to file an amended brief in compliance with Supreme Court Rules. The amended brief was filed on September 29, 1995.

On January 27, 1993, the Corporation Commission filed a Notice of Proposed Rulemaking. The notice involved Corporation Commission Rule 60. *See* OCC 165:35-1-2 and 165:35-11-3.[1] Rule 60 provides the procedure which must be utilized by a consumer, having available two or more electric suppliers, to switch from one supplier to another. In the event of such a switch by the consumer, the rule requires that the costs be paid to the replaced supplier by the acquiring supplier. The acquiring supplier is then forced, by Rule 60, to pass on the costs of the switch to the consumer.

In relevant part, Rule 60(b) currently reads:

In the event a consumer located in an area where two or more retail electric suppliers are entitled to serve elects to change the supplier providing retail service to him/her, the acquiring supplier must offer to purchase from the replaced supplier those facilities of the replaced supplier which are in place to provide service to such consumer. The acquiring supplier must also offer to pay the replaced supplier in an amount sufficient to offset the costs which the replaced supplier will incur as a result of the consumer's change of suppliers....

[T]he acquiring supplier shall require the consumer requesting a change of suppliers pursuant to this Section to reimburse the acquiring supplier for the amount which it pays to the replaced supplier....

nience we adopt this phraseology.

*See* 165:35–11–3.[2] The Rule goes on to explain what costs are recoverable and how

2. In full, Rule 165:35–11–3 reads as follows (including the added and deleted language as proposed by the amendment):

165:35–11–3. Changing retail suppliers in incorporated areas

(a) Under the provisions of the Retail Electric Supplier Certified Territory Act [17 O.S. §§ 158.21 et seq.] the Commission's authority to designate certified territories within which retail electric suppliers shall have the exclusive right to furnish retail electric service is limited to unincorporated areas of the state. As a result, in certain portions of incorporated areas of the State, two or more retail electric suppliers may be entitled to provide retail electric service to ~~consumers~~ *electric consuming facilities therein.* The purpose of this Section is to provide a method whereby a consumer *utilizing such an electric consuming facility* ~~located~~ in such an area can change retail electric suppliers in a manner which avoids unnecessary duplication of distribution facilities and maintains efficient and reliable service to all retail consumers in the State at the lowest reasonable cost.

(b) In the event a consumer *utilizing such an electric consuming facility* located in an area where two or more retail electric suppliers are entitled to serve elects to change the supplier providing retail service to ~~him/her~~ *such electric consuming facility*, the acquiring supplier must offer to purchase from the replaced supplier those facilities of the replaced supplier which are in place to provide service to such ~~consumer~~ *electric consuming facility.* The acquiring supplier must also offer to pay the replaced supplier an amount sufficient to offset the costs which the replaced supplier will incur as a result of the consumer's change of suppliers. The offer made by the acquiring supplier shall be equal to the following:

(1) The original cost less depreciation of those facilities of the replaced supplier which, pursuant to prudent engineering and operating standards, are reasonably necessary for and solely dedicated to providing retail service to the ~~consumer~~ *electric consuming facility* changing suppliers. Where the original cost less depreciation for that ~~consumer~~ *electric consuming facility* cannot be separately calculated, system-wide average cost shall be used.

(2) The cost of any facilities which, pursuant to prudent engineering and operating standards, are reasonably necessary to reintegrate the system of the replaced supplier in order that such system can continue to provide essentially the same retail service as was provided prior to the transfer and sale of facilities provided for in this Subchapter.

(3) An amount to the replaced supplier for the costs of any generating and transmission capacity which, at the time the consumer elects to change retail suppliers, is necessary for and dedicated to providing retail service to such ~~consumer~~ *electric consuming facility.* Unless otherwise agreed by the acquiring and replaced suppliers, this amount shall be equal to three (3) times the annual costs incurred by the replaced supplier which are attributable to such generating and transmission capacity. For purposes of this Subchapter, such annual costs of the replaced supplier shall be determined by multiplying the kilowatt hour sales made by the replaced supplier to the ~~consumer~~ *electric consuming facility* changing suppliers during the most recent twelve (12) month period (or an estimate of such sales in the event actual sales cannot be determined for the last twelve (12) months) multiplied by the replaced supplier's average generating and transmission costs per kilowatt hour.

(A) When the replaced supplier is an electric cooperative, its average generating and transmission costs shall be defined as the average generation and transmission capital costs of its wholesale power supplier(s), determined by multiplying the ratio of generating and transmission costs to total wholesale power costs as set forth in the wholesale power suppliers' most recent cost of service study used to support a wholesale rate change, by the current average wholesale electricity cost per kilowatt hour paid by the replaced supplier.

(B) When the replaced supplier is an investor-owned utility, its average generating and transmission costs shall be determined by multiplying the ratio of generating and transmission capital costs to total utility costs as set for thin such replaced supplier's most recent cost of service study approved by the Commission, by the current average electricity cost per kilowatt-hour paid by the consumer changing suppliers.

*(c) The information necessary to make the calculations set for in (b) of this Section shall be furnished to the acquiring supplier by the replaced supplier within then (10) days of the acquiring supplier's offer to purchase.*

~~(c)~~*(d)* When the acquiring supplier has made an offer of purchase in compliance with (b) of this Section, the replaced supplier shall within thirty (30) days accept such offer, take such action as is necessary to transfer ownership and possession of the facilities to the acquiring supplier, and take any other action which is reasonably required to facilitate the change of retail suppliers to the ~~consumer requesting such change~~ *electric consuming facility* in a safe and orderly manner.

~~(d)~~*(e)* Subject to the provisions of ~~(e)~~*(f)* of this Section, the acquiring supplier shall require the consumer requesting a change of suppliers pursuant to this Section to reimburse the acquiring supplier for the amount which it pays to the replaced supplier.

~~(e)~~*(f)* In determining costs to the consumer requesting a change in suppliers, the costs enumerated in (b)(1), (2), and (3) of this Section shall be charged by the acquiring supplier to the consumer. The costs to the consumer in

they are to be calculated. In Rule 165:35–1–2, the definition section, a definition for electric consuming facility was added, which stated that this term included "anything that utilizes electric energy from a central station source."

The proposed amendments to Rule 60 changed language to close a perceived loophole in the Rule. Prior to the proposed amendment some users of electricity could switch suppliers without paying the associated costs. For example, a renter in an apartment complex, or the purchaser of a home, could choose a supplier different than the one used by the previous renter or owner without being subject to the costs. The amendment attempted to close this loophole by changing the word "consumer" to "electric consuming facility," thus subjecting any "electric consuming facility" to the payment of change-over costs. The result is that the renter or new owner is not given the option of choosing a supplier different from that used by the previous occupant without being subject to the associated costs imposed by Rule 60.

The OCC's rule impact statement, as presented in the first paragraph of the Rule, claimed that the purpose of the rule was to require consumers to pay the costs associated with changing suppliers. PSO filed comments to the proposal, urging that the requirement for a consumer to pay costs be eliminated, because these costs are, in most instances, so great that the consumer can not afford to switch suppliers. O.G. & E. urged that the rule remain unchanged. The Oklahoma Association of Electric Cooperatives supported the change.

Before the hearing PSO made a motion to the administrative law judge that witnesses be sworn and subject to cross-examination. The administrative law judge agreed to PSO's request. When brought to a vote of the Commission members, they declined to follow the ALJ's recommendation and denied the motion, but agreed that all parties interested in making a comment at the hearing would be permitted to do so on the record.

At the hearing several individuals testified that their electrical service was undependable, and that they wished to switch from

(b)(1) and (2) of this Section may be offset by the application of the acquiring supplier's economic justification formula on file with the Commission and approved by the Director of the Public Utility Division. Further, these costs shall be charged by contract, or otherwise, by the acquiring supplier over a three (3) year period unless the consumer and the acquiring supplier agree on a shorter period of time.

(f)(g) The acquiring supplier shall provide to a consumer requesting a change of suppliers a statement, for a three (3) year period, setting forth an estimate of the annual amounts such consumer would pay in rate and charges to the replaced supplier and the annual amounts such consumer would pay in rates and charges to the acquiring supplier for amounts required to be paid pursuant to this Section. Such estimate shall be based upon rates and charges in effect at the time the estimate is made.

(g)(h) In the event there is a dispute or controversy over the amount required to be paid to the replaced supplier under this Section, or it the replaced supplier has not taken the action required under (e)(d) of this Section, either the acquiring supplier or the replaced supplier may commence a proceeding before the Commission requesting that the Commission determine the amount to be paid or take any other actions necessary to facilitate the requested change of suppliers in accordance with the provisions of this Section. If the Commission

has not made a final determination of such issue or taken such action within forty-five (45) days of the date when such proceeding was filed, the change of suppliers requested by the consumer shall be put into effect, if the consumer so desires, notwithstanding that a determination of the amount to be paid to the replaced supplier under this Section has not finally been determined. under such circumstances, the acquiring supplier may comply with the requirements by using the respective amounts alleged by the acquiring supplier and the replaced supplier as being in compliance with this Section.

(i)(h) This Section shall not apply to consumers making application for the initial service to an electric consuming facility his/her premises. Any changes in electric load at an electric consuming facility or premises where such facility is located shall not constitute an initial service for this Section unless such load changes render existing electric facilities obsolete. The replacement of transformers, service, drops and meters shall not constitute a rendering of existing facilities obsolete. and the The adoption of this Section by the Commission does not constitute an assertion by the Commission of jurisdiction or authority to designate the supplier for such new consumers electric consuming facilities nor to prohibit service by any supplier to new consumers electric consuming facility in any area where such supplier has a lawful right to serve.

their current supplier, an electric cooperative, to PSO. They stated that they believed their service would be of higher quality, while their electric bills would be lower. But they were unable to make the switch of suppliers because of the high costs imposed on them by Rule 60. For example, one business owner testified that by switching electric suppliers, his business would save about $3,000.00 per year. However, the costs imposed by Rule 60 amounted to approximately $36,000.00, and thus his business could not financially afford to change suppliers.

The mayor of Oolagah testified that the high costs of electricity supplied through the electric cooperative was hurting the economic growth of the town, because new businesses could not afford to locate there. The electric cooperative had been made aware of the City's dilemma, but had been unresponsive to the City's requests for more competitive utility rates.

The mayor of Bridgeport testified that he obtains electricity through an REC. His electrical service is unsatisfactory and is causing him financial loss, because it goes off three or four times per week. He testified that he could save $300.00 per year, but that the transfer costs would be over $1500.00.

The municipalities urged that the Rule not be amended. Because of our recent opinion in *Branch Trucking v. Oklahoma Tax Commission*, 801 P.2d 686 (Okla.1990), municipalities claim that they are losing tax revenue, rural electric cooperatives not being required to collect and remit sales taxes. Municipalities are in favor of any type of rule which would make it easier to change electric providers, because a different electric supplier could mean more tax revenue. These municipalities testified that without the tax revenue their police and fire departments are suffering, and they are attempting to find ways to "de-annex" parts of the municipality so as to cut costs.

Unimpressed with these comments from the public, the Corporation Commission voted to amend Rule 60. PSO appealed this ruling. On appeal, several parties representing citizens and municipalities have filed amicus briefs.[3]

### FAILURE TO TAKE SWORN TESTIMONY

■ First we need to address the procedural issue raised by PSO regarding the Commission's refusal to require sworn testimony. PSO urges that the procedural rules promulgated by the Corporation Commission require that sworn testimony be taken at all hearings. The Commission denies that its rules require sworn testimony for rulemaking proceedings.

■ The Corporation Commission has adopted procedural rules whose express purpose is to "govern all proceedings coming before the Corporation Commission for disposition." Rule 165:5–1–1. Once these rules are in place an agency is required to follow them. Failure to do so can result in an invalidation of the proceeding. *Henry v. Corporation Commission*, 825 P.2d 1262 (Okla.1992); *Branch Trucking v. Oklahoma Tax Comm'n*, 801 P.2d 686 (Okla.1990).

At the time of this hearing Corporation Commission Rule 165:5–1–7 stated that the Commission could "on its own motion, commence a cause to adopt, amend or modify rules of the Commission." The Rule required notice and a hearing.[4] Rule 165:5–13–3 governs the conduct of hearings, requiring that every witness shall be examined and cross-examined orally and under oath.

Rule 165:5–1–7 governs rulemaking at the Corporation Commission. It does not require the sworn testimony of witnesses. As evidenced by its later adoption of the Oklahoma Administrative Procedures Act, which permits public comment but does not require sworn testimony at rulemaking proceedings, the Corporation Commission did not contem-

---

3. Lakeside State Bank of Oologah, Jack Griffith Petroleum Products, and Municipalities for Fair Play filed amicus briefs.

4. Rule 165:5–1–7 has since been amended to state that in rulemaking proceedings, "[t]he

Commission shall comply with all applicable provisions of the Administrative Procedures Act." The Administrative Procedures Act does not require sworn testimony, but does allow for public comment. 75 O.S.1994 § 303(C).

plate that its rules should be interpreted to require sworn testimony at every rulemaking proceeding. Rule 165:5–1–7 required notice and a hearing. There is no question that both were satisfied in this case. Although there were no witnesses nor sworn testimony, all present at the hearing were permitted to make their comments to the Commission, and the comments were included in the transcript. We find no error in the Commission's refusal to require sworn testimony in the rulemaking proceeding.

## CONSTITUTIONAL ATTACKS

■ PSO next attacks the validity of Rule 60 and its amendment for several different reasons: (1) The Corporation Commission was without authority to promulgate the original rule and this amendment, because it amounts to an interference with the internal management of the utility company. (2) It violates the Oklahoma Constitution, Article 18, Sections 5 and 7. (3) It violates federal and state constitutional prohibitions against the taking of property without compensation. (4) It unlawfully delegates the Commission's authority by permitting generation and transmission costs to be determined by the wholesale supplier. Because we find the first argument persuasive we do not address the remaining constitutional attacks.

None of the parties contest that the costs for switching are high and very burdensome. None of them contest the fact that the high costs are often prohibitive of a switch by a consumer. Nor does any party contest that these costs, according to the rule, must be born by the consumer rather than by the acquiring supplier.

■ The Oklahoma Constitution at Article 9, Section 18 states the exact limit of the Corporation Commission's power and authority relevant to today's case:

The Commission shall have the power and authority and be charged with the duty of supervising, regulating and controlling all transportation and transmission companies doing business in this state, in all matters relating to the performance of their public duties and their charges therefor ... and to that end the Commission shall, from time to time, prescribe and enforce against

such companies, in the manner hereinafter authorized, such rates, charges, classifications of traffic, and rules and regulations, and shall require them to establish and maintain all such public service, facilities, and conveniences as may be reasonable and just. . . .

The Commission has the authority to promulgate rules of procedure. *Henry v. Oklahoma Corporation Comm'n*, 825 P.2d 1262 (Okla. 1990). These rules have the force and effect of law. *Id.; State ex rel. Villines v. Freeman*, 370 P.2d 307 (Okla.1962). The rules adopted by an administrative agency, such as the Corporation Commission, under legislative authority are presumed valid and reasonable. It is the burden of PSO to establish that the rule is unreasonable and invalid. *J. Brotton Corp. v. Oklahoma Alcoholic Beverage Laws Enforcement Comm'n*, 822 P.2d 683 (Okla.1991); *Toxic Waste Impact Group Inc. v. Leavitt*, 755 P.2d 626 (Okla.1988).

Title 17 O.S.Supp.1994 § 152 provides:

The Commission shall have general supervision over all public utilities, with power to fix and establish rates and to prescribe and promulgate rules, requirements and regulations, affecting their services, operation, and the management and conduct of their business; shall inquire into the management of the business thereof, and the method in which same is conducted.

Section 158.27 gives the Corporation Commission similar powers with regard to cooperatives and electric associations.

■ However, the Corporation Commission is a tribunal of limited jurisdiction. Only the authority expressly stated or necessary by implication is conferred by the Oklahoma Constitution. *Public Serv. Co. v. State*, 645 P.2d 465, 466 (Okla.1982). The Commission's power to regulate is not unfettered, but must be exercised only within the confines of the Constitution and existing statutes. *Id.*

PSO asserts that the Corporation Commission is without constitutional authority to mandate that the acquiring supplier pass the costs of the switch directly to the consumer rather than allowing the acquiring utility company to absorb the costs if it chooses.

PSO claims this is interference with internal management decisions, and such is not permitted by the Constitution. *See Public Serv. Co., supra.* On the other hand, the Commission urges that Rule 60 is constitutionally sound because it is merely a way of forcing the switching consumer to bear the costs rather than allowing the utility company to absorb costs which would then be passed on to every ratepayer. The Commission asserts that the regulation of rates is within its constitutional power.

In rebuttal PSO agrees that the Commission is entitled to guard the public's interests with regard to rates, but urges this could be accomplished without interference in internal business management. PSO suggests that these "changeover" costs could be deleted from the expenditures considered by the Commission for a rate increase. PSO states that the Commission is familiar with this practice, and has often refused certain expenses as a basis for a rate increase. By so doing, PSO points out that the cost of switching would not affect all ratepayers. It would simply be a decision that PSO management would have to make as to whether the expenditure would be worth the benefit gained. The cost would be carried by the shareholders.

This argument has merit. First, the Corporation Commission, with the blessing of the legislature, has made rules as to certain expenses which are not included in the "bottom line" for rate making purposes. For example, OCC Rule 165:35–7–6 states that gifts, donations, and contributions made by the regulated utility "shall be treated as 'below the line' expenses and excluded from operating expenses allowable for rate making purposes." Rule 165:35–27–1 speaks to expenses for business conduct which may not be considered for rate making purposes. Title 17 O.S.1991 180.2 states certain promotional practices may not be included as operating expenses for the purpose of a rate increase. PSO is correct in its assertion that these charges could be omitted from consideration when rate increases are the issue.

As for the remainder of the argument, in *Missouri Pac. Ry. Co. v. Corporation Comm'n,* 672 P.2d 44 (Okla.1983), we recognized a limitation on the authority of the Corporation Commission: "The Commission may regulate functions of corporations falling within its jurisdiction, only if the activity is impressed with public interest." *Id.; see also City of Chickasha v. Arkansas Louisiana Gas Co.,* 625 P.2d 638 (Okla.App.1981). In *Missouri Pac. Ry.,* the Commission mandated that railroads provide their employees with lockers. This Court held that such a rule was outside the scope of the authority of the Commission.

In *Oklahoma Gas & Electric Company v. Corporation Comm'n,* 543 P.2d 546 (Okla. 1975), the Commission attempted to prohibit a utility company from building a new generation station. The Commission asserted that under 17 O.S.1971 § 152 and Art. 9, Section 35, it had general regulatory power. Disagreeing with the Commission's position, we held "the Constitution does not clothe it with the general power of internal management and control incident to ownership." *Id.* at 551. We continued by quoting *Lone Star Gas Co. v. Corporation Comm'n,* 170 Okla. 292, 39 P.2d 547, 553 (1934):

> The powers of the Commission are to regulate, supervise, and control the public service companies in their services and rates, but *these powers do not extend to an invasion of the discretion vested in the corporate management. It does not include* the power to approve or disapprove contracts about to be entered into, nor to *the approval or veto of expenditures proposed.* (Emphasis Added)

*Id.* at 552. We concluded that the "Constitution simply does not confer upon the Corporation Commission, either expressly or by necessary implication, the power to regulate, supervise and control the internal management and control of a public utility...."

Likewise, in *Public Serv. Co. v. State,* 645 P.2d 465 (Okla.1982), the Commission attempted to regulate the utility's construction of a plant by refusing to permit the issuance of securities. We referred to our previous case law, stating that the Commission's power to regulate public utilities is limited to "public duties." *Id.* at 466. We held that the Constitution simply did not permit the

Commission's interference with the internal business decisions of a utility.

In *Smith Cogeneration Mgt. v. Corporation Comm'n,* 863 P.2d 1227, 1237 (Okla. 1993), we were again faced with the issue. There, the Commission reviewed the costs and capacity of the generation facilities of a company. The company asserted that this was interference with internal management. We disagreed, concluding that the Commission was making no attempt to regulate the internal management, but was simply reviewing costs for reasonableness.

Here, Rule 60 mandates that the change-over costs be passed on directly to the consumer. This clearly usurps the management function by forbidding the utility company from absorbing the costs. It is thus a "veto" of an expenditure proposed by PSO as acquiring supplier, and contrary to *Lone Star Gas Co., supra.* Recognizing that its power to regulate is limited to "public duties" or to practices which affect the "public interest," the Commission's only rationale for its rule is to insure that the costs of switching are not the basis for a rate increase to all ratepayers. Absent this reason there is no "public interest" to be protected.

The Commission has power to regulate the rates of a public utility. As PSO asserts, this includes the authority to refuse to consider certain costs and expenditures as providing a reasonable basis for a rate increase. Further, if the Commission is concerned with an "across the board" rate hike, the Commission may refuse the rate increase. How and who should absorb the cost of a change in electric suppliers is not within the realm of the Commission's authority, absent some public effect. Rule 60 clearly interferes with the internal management decisions of the utility companies.

## CONCLUSION

Rule 60, in its original form and as amended, is unconstitutional. It would give the Corporation Commission authority it does not otherwise have in that it interferes with the internal management decisions of the acquiring supplier. The Commission has the power to regulate rates, and in doing so may protect the public interest by refusing to allow these costs to be considered for the purpose of rate making.

The ruling of the Corporation Commission is reversed, and Rule 60 is declared invalid insofar as it would require an acquiring electric supplier to pass the costs of changing suppliers on to the consumer or user of the electricity.

KAUGER, V.C.J., and HODGES, LAVENDER, HARGRAVE and WATT, JJ., concur.

ALMA WILSON, C.J., concurs in result.

SIMMS and OPALA, JJ., dissent.