2007 OK CIV APP 87

**Lori WROTENBERRY, Director, Oil and Gas Conservation Division, Oklahoma Corporation Commission, Applicant/Appellee,**

v.

**XANADU EXPLORATION COMPANY, Respondent/Appellant.**

**No. 103,696.**

Court of Civil Appeals of Oklahoma, Division No. 3.

Aug. 10, 2007.

Charles B. Davis, Norman, OK, for Appellant.

Benjamin Jackson, General Counsel, Michele Craig, Deputy General Counsel, Oklahoma Corporation Commission, Oklahoma City, OK, for Appellee.

LARRY JOPLIN, Presiding Judge.

¶1 Respondent/Appellant Xanadu Exploration Company (Appellant) seeks review of an order of the Oklahoma Corporation Commission *en banc* determining Appellant in contempt of Commission rule and assessing a fine on the citation issued by Applicant/Appellee Lori Wrotenberry, Director, Oil and Gas Conservation Division, Oklahoma Corporation Commission (Commission). In this proceeding, Appellant challenges Commission's order as violating its constitutional right to equal protection of the laws, contrary to Commission's rules, and exceeding Commission's authority.

¶2 Appellant operated the Snake Eyes # 1 well in the center of the NW¼, § 36, T4N, R11E, I.M., Hughes County, Oklahoma. In the course of closing the well's reserve pit, Appellant's contractor "cut" the side of the pit with a bulldozer to allow the water in the

pit to escape, so the remaining mud in the pit would dry for disposal. During a routine inspection, a Commission inspector observed the condition, and cited Appellant for a "nonpermitted discharge from a noncommercial pit" in violation of O.A.C. 165:10–7–16(d)(5)(A).[1]

¶ 3 At hearing on the citation, Commission presented the testimony of the inspector concerning his observations at the well site. The inspector testified that "dewatering," allowed by O.A.C. 165:10–7–16(e)(1) without a permit, required removal, transportation and disposal of the water component away from the well site, and that the discharge of water from the pit constituted a nonpermitted discharge in violation of O.A.C. 165:10–7–16(d)(5)(A).

¶ 4 Appellant offered expert testimony to show that the contents of the pit consisted of a layer of predominantly "fresh" water containing little or no contaminants on top of a heavier layer of drilling mud. Appellants' witnesses also testified that, as a matter of industry custom, and to comply with O.A.C. 165:10–7–16(e) governing closure of reserve pits, operators typically drained the upper layer of "fresh" water onto the surface to allow drying of the underlying layer of mud; and, that the "fresh" water discharged from the pit did not constitute a "deleterious substance" under Commission regulation. So, said Appellants, because O.A.C. 165:10–7–16(d) governed the "protection from pollution," it consequently had committed no "nonpermitted discharge" of a polluting deleterious substance in violation of O.A.C. 165:10–7–16(d)(5)(A).

¶ 5 Upon consideration of the evidence, an Administrative Law Judge (ALJ) concluded the water discharged from the pit did not constitute a "deleterious substance" or "pollution," and that Appellant had consequently committed no violation of the cited section. Upon referral, an Appellate Referee recommended reversal of the ALJ's order, noting that O.A.C. 165:10–7–17[2] and O.A.C. 165:10–7–19[3] governed surface discharges; that

1. That section, entitled "Use of noncommercial pits," provides in pertinent part:

   (a) Scope. This Section shall cover the permitting, construction, operation, and closure requirements for any noncommercial pit. A noncommercial pit is an earthen pit which is located either on-site or off-site and is used for the handling, storage, or disposal of drilling fluids and/or other deleterious substances produced, obtained, or used in connection with the drilling and/or operation of a well or wells, and is operated by the generator of the waste.
   . . . .
   (d) Operation and maintenance requirements.
   . . . .
   (5) Prevention of pollution.
   (A) All noncommercial pits shall be constructed, used, operated, and maintained at all times so as to prevent pollution. In the event of a nonpermitted discharge from a noncommercial pit, sufficient measures shall be taken by the operator to stop or control the loss of contents, and reporting procedures pursuant to 165:10–7–5(c) shall be followed. Any materials lost from a pit shall be cleaned up as directed by any Field Operations representative. For a willful non-permitted discharge from a noncommercial pit, the operator may be fined up to $2,000.00. . . .

2. That section, entitled "Surface discharge of fluids," provides in pertinent part:
   (a) Scope. This Section shall cover the surface discharge of hydrostatic test water, storm water from diked areas, and produced water from tanks or other containment vessels.
   . . . .
   (c) Discharge of storm water. Storm water accumulations in any diked area built for the containment of tank battery spills may be discharged as necessary without a permit, notification to the Commission, or adherence to any other provisions of this Section, provided the following conditions are met:
   . . . .
   (j) Discharge from reserve pits. Water accumulation in any reserve pit used for the containment of air drilling cuttings or water-based drilling fluids may be discharged to land provided a permit is obtained from the Commission. Any operator discharging without a permit may be fined $5,000.00. . . .

3. That section, entitled "One-time land application of water-based fluids from earthen pits and tanks," provides in pertinent part:
   (a) Authority for land application. No person shall land apply fluids except as provided by 165:10–9–2, 165:10–7–17, or this Section. Any operator failing to obtain a permit shall be fined $2,000.
   (b) Scope. This Section shall cover the land application of water-based drilling fluids and cuttings from earthen pits, tanks, or other containment structures; however, this Section shall not be exclusive of other authorities for land application listed in (a) of this Section. Any land application made under this Section

those sections required a permit and pre-discharge sampling of the effluent; and opined that, absent such a permit, Appellant's discharge of water from the reserve pit without a permit constituted a violation of O.A.C. 165:10–7–16(d)(5)(A). Upon consideration of the report of the Appellate Referee, a divided Commission *en banc* adopted the referee's findings, determined Appellant had violated O.A.C. 165:10–7–16(d)(5)(A) and assessed a fine of $2,000.00.

¶ 6 "[I]n all appeals involving an asserted violation of any right of the parties under the Constitution of the United States of the Constitution of the State of Oklahoma, the Court shall exercise its own independent judgment as to both the law and the facts." Okl. Const., art. IX, § 20. The appellate courts, however, "determine constitutional questions only if necessary to adjudicate the rights of the parties," and if the case can be decided without addressing the constitutional issue, we should do so. *Ranola Oil Co. v. Corporation Com'n of Oklahoma,* 1988 OK 28, ¶ 7, 752 P.2d 1116, 1118.

¶ 7 "In all other appeals from orders of the Corporation Commission the review by the Supreme Court shall not extend further than to determine whether the Commission has regularly pursued its authority, and whether the findings and conclusions of the Commission are sustained by the law and substantial evidence." Okl. Const., art. IX, § 20. "The term 'substantial evidence' means something more than a scintilla of evidence and means evidence that possesses something of substance and of relevant consequence such as carries with it fitness to induce conviction, [but] is such evidence that reasonable men may fairly differ as to whether it establishes a case." *Central Oklahoma Freight Lines, Inc. v. Corporation Commission,* 1971 OK 57, ¶ 15, 484 P.2d 877, 879. "Determining whether the Commission's findings are supported by substantial evidence does not require that the evidence be weighed, but only that the totality of the record be examined and the proof found to be 'more than mere scintilla.'" *MCI Telecommunications Corp. v. State,* 1991 OK 86, ¶ 22, 823 P.2d 351, 358.

¶ 8 The Corporation Commission possesses " 'exclusive jurisdiction, power and authority governing the disposition of deleterious substances incidental to petroleum production and to promulgate rules and regulations to prevent pollution of the surface and subsurface waters in the state.' " *Meinders v. Johnson,* 2006 OK CIV APP 35, ¶ 26, 134 P.3d 858, 866–867. Commission rules have the force and effect of law. *See, e.g., Public Service Co. of Oklahoma v. State, ex rel. Corp. Com'n,* 1997 OK 145, ¶ 23, 948 P.2d 713, 717. "Once [the] rules are in place an agency is required to follow them[,][and][f]ailure to do so can result in an invalidation of the proceeding." *Public Service Co. of Oklahoma v. State ex rel. Corp. Com'n ex rel. Loving,* 1996 OK 43, ¶ 13, 918 P.2d 733, 737.

¶ 9 In the examination of Commission rules, we apply the traditional rules of construction. *See, e.g., Barnes v. Transok Pipeline Co.,* 1976 OK 27, ¶ 15, 549 P.2d 819, 822. In this respect, "we must consider relevant portions together, where possible, to give force and effect to each statute." *Samson Hydrocarbons Co. v. Oklahoma Tax Com'n,* 1998 OK 82, ¶ 15, 976 P.2d 532, 537–538. (Citation omitted). Moreover, "administrative rules, like statutes, are given a sensible construction bearing in mind the evils intended to be avoided," and the "construction by agencies charged with the law's enforcement is given persuasive effect." *Cox v. State ex rel. Oklahoma Dept. of Human Services,* 2004 OK 17, ¶ 22, 87 P.3d 607, 616. "The Commission's findings are presumed correct in matters it frequently adjudicates and in which it possesses expertise." *MCI Telecommunications Corp.,* 1991 OK 86, ¶ 22, 823 P.2d at 358.

¶ 10 In its first proposition, Appellant complains "[t]he Commission has not followed its own rules." Here, Appellant asserts the uncontroverted evidence demonstrated that the discharge was predominantly "fresh" water; that a post-discharge test of the soil near the pit outlet demonstrated salinity well below levels acceptable to the Commission for sur-

---

shall be done from a single well to land that has not been previously permitted and used for

this practice or similar practices for at least three (3) years. . . .

face discharge; and, that the discharge of such "fresh" water from the reserve pit was not only allowed without permit under O.A.C. 165:10–7–17,[4] but was also required for timely pit closure by O.A.C. 165:10–7–16(e)(1) and (7).[5] So, says Appellant, in the absence of evidence demonstrating a violation of O.A.C. 165:10–7–16(d)(5)(A), the order of the Commission must be reversed.

¶ 11 Corporation Commission regulations require a Permit to Drill prior to commencement of drilling operations. O.A.C. 165:10–3–1(a)(1). As a requirement to obtain a Permit to Drill:

> The operator shall indicate . . . the proposed method(s) for disposal of drilling fluids[,][but] . . . [the][i]ssuance of the Permit to Drill shall not be construed as constituting approval of the disposal method(s) indicated[,][and][a]n operator who desires to dispose of drilling fluids through either evaporation/dewatering and leveling of the reserve pit, soil farming, commercial earthen pit disposal, or annular injection must comply with 165:10–7–16, 165:10–7–

19 or 165:10–9–2, 165:10–9–1, or 165:10–5–13 respectively.

O.A.C. 165:10–3–1(f)(1), (3).

¶ 12 According to Commission's inspector, the "dewatering" of a reserve pit required the removal, transportation and disposal of the water elsewhere, and that "dewatering" did not mean the mere draining the water from the pit onto the surface, although Appellant's expert testified otherwise. As we read the plain language of § 10–7–16(e)(1)(a), allowing "dewatering" without a permit, together with the plain language of § 10–7–16(e)(1)(d), noting the necessity of a permit for any "land application," and the plain language of §§ 10–7–19(a), (b), and (f), governing the "[o]ne-time land application of water-based fluids from earthen pits and tanks," and absolutely proscribing the "land application" of "fluids" without a permit, we are convinced that "dewatering" as used in § 10–7–16(e)(1) contemplates only the removal, transportation and disposal of the water component of the reserve pit at some approved disposal site as the Commission inspector explained.[6]

¶ 13 Further, § 10–7–17(b),[7] (c)[8] and (d)[9]

---

4. See, footnote 2, supra.

5. Subsection (e), entitled "Closure requirements," provides in pertinent part:

> (1) Designation of disposal method. The operator of any reserve/ circulation pit shall indicate the proposed method of disposal of drilling fluids and/or cuttings on Form 1000 as required by 165:10–3–1(f). Options shall be limited to the following, unless written approval is granted by a Field Operations representative:
> (A) Evaporation/dewatering and backfilling.
> (B) Chemical solidification of pit contents.
> (C) Annular injection (requires permit).
> (D) Land application (requires permit).
> (E) Disposal in permitted commercial pit.
> (F) Disposal at permitted commercial soil farming facility.
> (G) Disposal at permitted recycling/reuse facility.
> . . . .
> (7) Time limits. Any noncommercial pit shall be closed within the time limits set forth in this paragraph. Any extension of time for pit closure must be requested by the operator, who shall file an application pursuant to OAC 165:5–7–33. A legal change of operator of any noncommercial pit shall not extend the time limit for closure. If a noncommercial pit is converted from one type of use to another, the

last use shall determine the time limit for closure. . . .

6. Sections 10–9–1 and 10–9–2 govern "the permitting, construction, operation, and closure requirements for any *commercial pit* [,] [i.e.,] a disposal facility which is authorized by Commission order and used for the disposal, storage, and handling of deleterious substances or soils contaminated by deleterious substances produced, obtained, or used in connection with drilling and/or production operations," and, by their own terms, do not apply to the closure of Appellant's *non-commercial reserve pit*. (Emphasis added.) Section 10–5–3 speaks only to the "authorization for . . . existing disposal wells," and likewise does not apply here.

7. Section 10–7–17(b) allows the surface discharge of *only hydrostatic test water* "used in the testing of new pipeline segments, new casing, new tubing, new tanks and new vessels," or "used in the testing of existing tanks, vessel lines and transmission pipelines" without a permit.

8. Section 10–7–17(c) allows the discharge of *only* "[s]torm water accumulations in any diked area built for the containment of tank battery spills . . . without a permit."

9. Section 10–7–17(d) allows *only* the "[d]ischarge of produced water."

all condition a "the surface discharge of hydrostatic test water, storm water from diked areas, and produced water from tanks or other containment vessels" without a permit upon compliance with specific requirements, including a pre-discharge threshold test for salinity. Most importantly, however:

> **Discharge from reserve pits.** *Water accumulation in any reserve pit used for the containment of air drilling cuttings or water-based drilling fluids may be discharged to land provided a permit is obtained from the Commission . . . .*

O.A.C. 165:10–7–17(j). (Emphasis added.)

■ ¶ 14 Reading §§ 10–3–1(f), 10–7–16, 10–7–17 and 10–7–19 together, it is absolutely clear the Commission takes the prevention of pollution very seriously, and to that end, extensively regulates surface discharges. Giving effect to each of the provisions, we hold neither § 10–7–16, § 10–7–17 nor § 10–7–19 allow a surface discharge from a reserve pit without a permit.

■ ¶ 15 Moreover, § 10–7–17(j) specifically governs the "[d]ischarge from reserve pits," and unequivocally requires a permit for the surface discharge of the "[w]ater accumulation in any reserve pit used for the containment of air drilling cuttings or water-based drilling fluids." The uncontroverted evidence demonstrates such a discharge in the present case. We consequently discern no failure of the Commission to follow its rules as alleged in Appellant's first proposition.

■ ¶ 16 In its second proposition, Appellant complains of the denial of its rights to equal protection. Here, Appellant points to the testimony of its witnesses establishing the non-polluting nature of the discharge from its reserve pit, and the custom of the industry, followed for twenty-five years, of "dewatering" a reserve pit by surface discharge without a permit. So, says Appellant, because the Commission treats it differently from other operators, Commission violated its right to equal protection of the laws.

¶ 17 The Oklahoma Legislature has charged the Commission with the power and duty "to make and enforce such rules and orders . . . as are reasonable and necessary for the purpose of preventing the pollution of the surface and subsurface waters in the state, and to otherwise" prevent oilfield pollution. 52 O.S. § 139. The Oklahoma Supreme Court has recognized the authority of the Commission to regulate "the drilling of oil and gas wells as may be necessary to . . . prevent the pollution of freshwater" as a valid exercise of the state's police power. *State ex rel. Corp. Comm'n v. Texas County Irr. and Water Resources Ass'n., Inc.*, 1991 OK 63, ¶ 14, 818 P.2d 449, 453.

¶ 18 The Legislature and Commission have clearly spoken: the prevention of pollution of the surface and subsurface from oil field operations is of paramount public interest. To that end, the Commission devotes substantial resources to enact and amend its regulations in compliance with changes in federal and state environmental protection law. It is clear that the Commission rules which require a *permit and pre-discharge testing of the effluent* were implemented to assure no pollution occurs when operators propose to dispose of water accumulations from a well site onto the surrounding surface. To allow a nonpermitted discharge, based on *post-discharge testing of the surface*, wholly avoids the regulatory scheme designed to prevent pollution *before* the pollution occurs.

¶ 19 While simply draining the water component of reserve pits onto the surface may have been the industry custom in the past, the Commission rules governing surface discharges has been in effect since 1999, and we hold the Commission acted within its authority to regulate this area of environmental hazard. In citing Appellant for a violation of § 10–7–16, we discern no unequal application of Commission rules as alleged.

■ ¶ 20 In its third proposition, Appellant asserts that O.A.C. 165:10–7–17(c) specifically allows the surface discharge of water accumulations without a permit. So, says Appellant, by holding it in violation of O.A.C. 165:10–7–16(d)(5)(A), the Commission has improperly affected a change of its own rules.

¶ 21 We disagree. Section 10–7–17(c) allows *only* the discharge of "[s]torm water accumulations in any diked area built for the containment of tank battery spills . . .

*without a permit."*[10]   (Emphasis added.) The uncontroverted evidence demonstrated the discharge in the present case was not "[s]torm water accumulations in any diked area built for the containment of tank battery spills," but rather was a discharge from Appellant's reserve pit. By force of the specific language of § 10–7–17(j), an operator may not discharge the contents of a reserve pit to the surface without a permit. The specific provisions of § 10–7–17(j) control. We discern no impermissible rule-making as alleged in the third proposition.

¶ 22 The Corporation Commission has regularly pursued its authority, and we perceive no constitutional infirmity in the challenged regulations. The record contains substantial evidence to support a finding of Appellant's violation of O.A.C. 165:10–7–16(d)(5)(A). The order of the Corporation Commission is AFFIRMED.

ADAMS, J., and MITCHELL, V.C.J., concur.

**10.**   See, footnote 8.