IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2024-NMSC-017

Filing Date: June 10, 2024

No. S-1-SC-37948

SOCORRO ELECTRIC
COOPERATIVE, INC.,

     Appellant,

v.

NEW MEXICO PUBLIC
REGULATION COMMISSION,

     Appellee,

and

NEW MEXICO INSTITUTE OF
MINING AND TECHNOLOGY
and CITY OF SOCORRO,

     Interveners.

In the Matter of the Filing
of Advice Notice No. 69
by Socorro Electric Cooperative, Inc.
NMPRC Case No. 18-00383-UT

APPEAL FROM THE NEW MEXICO PUBLIC REGULATION COMMISSION

Wiggins, Williams & Wiggins, PC
Lorna M. Wiggins
Patricia Green Williams
Albuquerque, NM

for Appellant

Judith Ellen Amer, Associate General Counsel
Santa Fe, NM

for Appellee

Rodey, Dickason, Sloan, Akin & Robb, P.A.
Charles K. Purcell
Mark Kidee Adams
Cynthia A. Loehr
Albuquerque, NM

for Intervenor New Mexico Institute of Mining and Technology

Stelzner, Winter, Warburton, Flores, Sanchez & Dawes, P.A.
Nann M. Winter
Keith W. Herrmann
Albuquerque, NM

for Intervenor City of Socorro

**OPINION**

**VARGAS, Justice.**

## I.      INTRODUCTION

**{1}**      The Public Utility Act (PUA) grants the New Mexico Public Regulation Commission (Commission) "general and exclusive power and jurisdiction to regulate and supervise every public utility in respect to its rates." NMSA 1978, § 62-6-4(A) (2003). The PUA also distinguishes rural electric cooperatives from other public utilities with respect to the setting of rates. NMSA 1978, § 62-3-2(A)(3) (1985). While the PUA generally grants the Commission broad powers to review rates proposed by utilities before those rates take effect, NMSA 1978, § 62-8-7(B) (2011), the PUA provides that rates proposed by a rural electric cooperative "shall become effective as proposed" unless certain conditions are met. Section 62-8-7(H). Specifically, Section 62-8-7(H) provides that, before the Commission can inquire into the reasonableness of a cooperative's proposed rates, a certain number of cooperative members must file objections to the rates, and the Commission must find that there is just cause for review.

**{2}**      The Socorro Electric Cooperative, Inc., (SEC) is a public utility and rural electric cooperative organized under the Rural Electric Cooperative Act (RECA), NMSA 1978, §§ 62-15-1 to -37 (1939, as amended through 2021). SEC appeals from an order of the Commission rejecting rates proposed by SEC and directing SEC to adopt rates which the Commission determined to be just and reasonable. Relying on the limited nature of the Commission's jurisdiction over rural electric cooperatives, SEC argues that the Commission's order exceeds the agency's authority. In essence, SEC contends that the Commission had no power to fix different rates for SEC but could only approve or deny the rates as proposed. SEC also asserts that the order is arbitrary and capricious and is not supported by substantial evidence. The Commission responds that it properly exercised its authority to fix just and reasonable rates for SEC and defends its ratemaking decisions. The Commission is supported on appeal by the City of Socorro

(the City) and the New Mexico Institute of Mining and Technology (New Mexico Tech), who are both members and ratepayers of SEC.

**{3}**     For the reasons discussed herein, we determine that once the Commission's jurisdiction under Section 62-8-7(H) is invoked, the Commission has plenary authority to resolve the issues identified in the ratemaking proceeding and may determine the just and reasonable rates to be charged by a cooperative in accordance with Section 62-8-7(C) and (D). We also conclude that the Commission's denial of SEC's proposed rates and other ratemaking decisions are within the scope of the Commission's authority under Section 62-8-7(H), are reasonable, and are supported by substantial evidence. We therefore affirm the Commission's final order. NMSA 1978, § 62-11-5 (1982).

## II.     BACKGROUND

**{4}**     In December 2018, SEC filed an Advice Notice informing the Commission that it was proposing to increase rates by approximately $1.25 million or 5.06% from its 2017 test year. *See P.N.M. Gas Servs. v. N.M. Pub. Util. Comm'n* (*PNM Gas*), 2000-NMSC-012, ¶ 6, 129 N.M. 1, 1 P.3d 383 (explaining the test-year method). SEC also proposed to reallocate revenue collections among its customer classes because a Cost of Service Study procured by SEC had revealed significant subsidization of its residential, lighting, and irrigation classes. SEC similarly proposed to redesign several of its rates, including adding a $5.00 per month "Minimum Use Charge" applicable to its low-usage customer accounts.

**{5}**     Several SEC members filed protests with the Commission objecting to the proposal's failure to demonstrate that the rate increase was "fair, just and reasonable." The Commission later found that a sufficient number of SEC's members had filed valid and timely protests and that the protests constituted just cause for the Commission to review the proposed rates. The Commission notified SEC that it would hold an evidentiary hearing on several issues broadly related to the reasonableness of the rates and appointed a Hearing Examiner to oversee the proceedings.

**{6}**     During the months leading up to the hearing, the Hearing Examiner ordered SEC to provide more information about the method that SEC had relied upon to calculate its proposed revenue requirement. The Hearing Examiner explained that rural electric cooperatives commonly use a debt service coverage ratio to determine their revenue needs. Debt service coverage ratios measure a cooperative's ability to pay long-term debt. In response to the Hearing Examiner's order, SEC indicated that it had not used a debt service coverage ratio to calculate its revenue requirement, but instead had used a cash-margins methodology. SEC's proposed revenue requirement therefore was set as "a function of the margins and cash necessary to meet the financial objectives set by the Board of Trustees."

**{7}**     The Hearing Examiner also presided over an evidentiary hearing on SEC's proposed rates. Among other exhibits and testimony, SEC submitted the testimony of its CEO, Joseph Herrera. Although Herrera cited various declining market factors as supporting the proposed rates, he admitted that SEC did not need increased revenue to

maintain its financial integrity or its ability to continue serving customers. Instead, Herrera stated, consistent with SEC filings, that the proposed rates were designed to provide margins that achieved the SEC Board of Trustees' financial objectives, which he identified as growing SEC's equity, maintaining SEC's cash reserves, maintaining adequate debt service coverage ratios, and providing sufficient revenue to fund the retirement of member patronage credits of approximately $688,000 per year. *See* NMSA 1978, § 62-15-20 (1939) (addressing patronage refunds to members of rural electric cooperatives).

**{8}**     The City, New Mexico Tech, and a residential customer who had intervened in the proceedings submitted opposing testimony and evidence. For example, New Mexico Tech's expert witness opined that the Commission should deny SEC's proposed revenue increase because SEC was "generating adequate reserves to meet its obligations" with a "debt coverage ratio within an acceptable range." The City also submitted documentary evidence showing that SEC's sales had remained relatively constant and that SEC's gross revenues had increased since 2013.

**{9}**     The Hearing Examiner later issued a Recommended Decision advising the Commission to deny SEC's proposed increased rates. The Hearing Examiner suggested that the Commission reject SEC's cash-margins method of calculating its revenue requirement, explaining that she was "unaware of any [Commission] docketed rural electric cooperative rate case in which a cooperative or the Commission has calculated the revenue requirement based on the cash margins required to meet a cooperative board's goals." The Hearing Examiner instead noted that the Commission had consistently used a debt service coverage ratio to determine a rural electric cooperative's revenue needs. After considering the characteristics of SEC and the evidence available in the record, the Hearing Examiner concluded that the "Operating Times Interest Earned Ratio" (OTIER) provided an effective debt service coverage ratio method for evaluating SEC's need for a revenue increase.

**{10}**    As explained by the Hearing Examiner, a cooperative's OTIER is calculated by comparing the cooperative's "net operating margins" (defined as the excess of revenue from electricity sales over operating expenses) to the cooperative's interest expense on long-term debt. A cooperative's OTIER thus measures "how many times a cooperative earns its interest expense. An OTIER of 1.0 essentially means that a cooperative is earning just enough to pay its interest." SEC had supplied evidence that in 2017 its OTIER was 1.21 and that in 2018 its OTIER was 1.37. SEC's 2017 OTIER of 1.21 thus meant that "it had about 20% on top of the minimum available to pay interest expense." The Hearing Examiner also noted that the Rural Utilities Service, a division of the United States Department of Agriculture and SEC's primary lender, requires SEC to maintain a minimum OTIER of 1.10. 7 C.F.R. § 1710.114(b)(1) (2023). Based on data provided by Commission Staff, the Hearing Examiner stated that three other New Mexico rural electric cooperatives comparable to SEC had OTIERs between 1.32 and 1.46. New Mexico Tech's expert further confirmed that a maximum target OTIER for rural electric cooperatives is in the range of 1.3 to 1.5. The Hearing Examiner thus concluded that SEC's 2018 OTIER of 1.37 fell within an "acceptable range."

**{11}** SEC's proposed revenue increase would raise its OTIER to 1.84. The Hearing Examiner found that SEC had not proved the need to raise its OTIER to this proposed ratio, specifically noting that Herrera had admitted that SEC's financial integrity and ability to serve customers would not be compromised if it did not receive the rate increase. The Hearing Examiner also explained that the financial data in SEC's 2017 and 2018 annual reports confirmed that "it is unnecessary to authorize SEC a higher OTIER." For example, the Hearing Examiner found that in 2017, SEC was able to retire $423,406 in patronage credits and add $3,850,194 in net value of its plant. From 2017 to 2018, SEC's patronage capital balance increased to over $1.4 million, its OTIER increased by 13.2%, and its operating margin increased by 21.9% to $569,256. As explained by the Hearing Examiner, SEC's "operating margin is effectively its profit."

**{12}** The Hearing Examiner concluded that it was "crystal clear" that SEC sought increased revenues to advance the Board of Trustees' objectives of increasing equity, growing cash margins, and seeking earlier retirement of patronage credits. The Hearing Examiner noted that, throughout the proceeding, "SEC seem[ed] to believe that it is entitled to its proposed revenue increase because its Board is *entitled* to advance or achieve its goals." The Hearing Examiner suggested, however, that "[w]hether a rural electric cooperative's proposed rates are just and reasonable is not determined by whether the rates allow the Board to advance or achieve its goals." The Hearing Examiner instead emphasized, "'[U]nder the PUA, a rate is just and reasonable when it balances'" the interests of the "cooperative management—the Board and the General Manager—and the members/ratepayers" (quoting *Att'y Gen. v. N.M. Pub. Regul. Comm'n*, 2011-NMSC-034, ¶ 13, 150 N.M. 174, 258 P.3d 453 (citation omitted)). The Hearing Examiner stated, "[d]enial of a revenue increase will require SEC's Board to juggle its goals," but concluded that SEC's current rates would allow "SEC to earn margins that the Board can use toward meeting its goals."

**{13}** Although the Hearing Examiner recommended denying the proposed increased rates, she agreed that it was appropriate to reallocate revenue collections due to significant subsidization among SEC's customer classes. However, the Hearing Examiner disagreed with SEC's proposed reallocation, noting specifically that this Court has discouraged using cost of service as a sole criterion in designing rates. The Hearing Examiner instead explained that a "guiding principle" was to move each customer class to full cost of service contribution "in a gradual manner that avoids rate shock."

**{14}** For example, a Cost of Service Study procured by SEC showed that revenues allocated to the Residential class would have to increase by 29.10%, revenues allocated to the Lighting class would have to increase by 21.28%, and revenues allocated to the Irrigation class would have to increase by 89.87% for each of these classes to contribute to its full cost of service. SEC had proposed less significant increases of 6.66% for the Residential class, 10.26% for the Irrigation class, and 9.08% for the Lighting class. The Hearing Examiner recommended only slight increases of 2% for the Residential class and 3% for the Irrigation class, explaining that the Commission had received "persuasive public policy reasons for not further reducing the alleged subsidy" to the Residential class and that this reallocation would gradually lead to each class contributing fully to its cost of service. The Hearing Examiner recommended that

revenues allocated to the Lighting class "remain unchanged" because she found the Cost of Service Study "overstated" the subsidy to this class.

**{15}** Similarly, the Cost of Service Study showed that revenues allocated to the Large Commercial class would have to decrease by 17.38% and revenues allocated to the Load Management class would have to decrease by 16.00% to reflect those classes' full cost of service. Although the Cost of Service Study recommended commensurate decreases for these classes, SEC had proposed increases of 2.66% for the Large Commercial class and 3.35% for the Load Management class. The Hearing Examiner rejected both the Study's and SEC's proposed reallocations, concluding that "[a] just and reasonable outcome is to allocate an approximate 1.73%, or $20,000, base revenue decrease to the Load Management Service Class, and an approximate 1.9%, or $181,674, base revenue decrease to the Large Commercial Service Class." The Hearing Examiner also recommended that the Commission make several adjustments to SEC's proposed rate design, including rejecting the proposed $5.00 per month "Minimum Use Charge" for SEC's Residential, Energy Thermal Storage, and Small Commercial classes because "it would be punitive to low-use customers and result in rate shock."

**{16}** The Commission later rejected SEC's exceptions and fully adopted the Hearing Examiner's Recommended Decision in a final order. SEC filed a timely notice of appeal. NMSA 1978, § 62-11-1 (1993); Rule 12-601 NMRA.

## III.    STANDARD OF REVIEW

**{17}** As the party appealing the Commission's final order, SEC bears the burden to show that the order is unreasonable or unlawful. NMSA 1978, § 62-11-4 (1965). We will annul and vacate the order if it is arbitrary or capricious, unsupported by substantial evidence, outside of the scope of the Commission's authority, or otherwise contrary to law. *Albuquerque Bernalillo Cnty. Water Util. Auth. v. N.M. Pub. Regul. Comm'n* (*ABCWUA*), 2010-NMSC-013, ¶ 17, 148 N.M. 21, 229 P.3d 494.

**{18}** When reviewing orders from the Commission, we keep in mind that "Commission decisions requiring expertise in highly technical areas, such as utility rate determinations, are accorded considerable deference." *El Vadito de los Cerrillos Water Ass'n v. N.M. Pub. Serv. Comm'n*, 1993-NMSC-041, ¶ 11, 115 N.M. 784, 858 P.2d 1263. We accord less deference "when reviewing determinations outside the realm of the Commission's expertise." *Id.* "Because statutory construction itself is not a matter within the purview of the Commission's expertise, we afford little, if any, deference to the Commission on this matter." *N.M. Indus. Energy Consumers v. N.M. Pub. Regul. Comm'n* (*NMIEC*), 2007-NMSC-053, ¶ 19, 142 N.M. 533, 169 P.3d 105 (internal quotation marks and citation omitted). However, we "will confer a heightened degree of deference to legal questions that implicate special agency expertise or the determination of fundamental policies within the scope of the agency's statutory function." *Morningstar Water Users Ass'n v. N.M. Pub. Util. Comm'n*, 1995-NMSC-062, ¶ 11, 120 N.M. 579, 904 P.2d 28 (internal quotation marks and citation omitted).

**{19}** SEC primarily asserts that the Commission exceeded the scope of its jurisdiction and authority. "The Commission is an administrative body created by statute and obtains authority and jurisdiction expressly or by necessary implication from the statute creating it." *El Vadito*, 1993-NMSC-041, ¶ 12. The extent of the Commission's jurisdiction and authority are questions of law which we review de novo. *See NMIEC*, 2007-NMSC-053, ¶ 19. We accord little deference to the Commission's interpretation of its own jurisdiction. *Doña Ana Mut. Domestic Water Consumers Ass'n v. N.M. Pub. Regul. Comm'n*, 2006-NMSC-032, ¶ 7, 140 N.M. 6, 139 P.3d 166.

**{20}** SEC also argues that the Commission's decision is not supported by substantial evidence. A decision is supported by substantial evidence if a review of the whole record reveals credible evidence "that is sufficient for a reasonable mind to accept as adequate to support the conclusion reached by the agency." *NMIEC*, 2007-NMSC-053, ¶ 24 (internal quotation marks and citation omitted). We view the record in the light most favorable to the Commission's decision, *PNM Gas*, 2000-NMSC-012, ¶ 4, and we will not substitute our judgment for that of the Commission if the decision is supported by substantial evidence on the record as a whole, *Doña Ana*, 2006-NMSC-032, ¶ 11.

**{21}** SEC further contends that the Commission's decision is arbitrary and capricious. "'A ruling by an administrative agency is arbitrary and capricious if it is unreasonable or without a rational basis, when viewed in the light of the whole record.'" *Pub. Serv. Co. of N.M. v. N.M. Pub. Regul. Comm'n* (*PNM*), 2019-NMSC-012, ¶ 16, 444 P.3d 460 (quoting *Rio Grande Chapter of Sierra Club v. N.M. Mining Comm'n*, 2003-NMSC-005, ¶ 17, 133 N.M. 97, 61 P.3d 806).

## IV. DISCUSSION

### A. The Business Judgment Defense Has Been Incorporated in This Court's Standard of Review

**{22}** SEC primarily challenges the Commission's final order as unlawful. Specifically, SEC asserts that the order invades the exclusive prerogative of the SEC's Board of Trustees to set financial objectives for SEC, to choose a method of calculating SEC's revenue requirement, and to allocate revenues and design rates. In support of this argument, SEC cites the United States Supreme Court's opinion in *Missouri ex rel. Southwestern Bell Telephone Co. v. Public Service Commission of Missouri*, 262 U.S. 276 (1923), which indicates that "while the state may regulate with a view to enforcing reasonable rates and charges, it is not the owner of the property of public utility companies, and [it] is not clothed with the general power of management incident to ownership." *Id.* at 289.

**{23}** We assess that SEC is relying on a "business judgment" or *invasion of management* defense to the Commission's regulation of its rates. Although we have recognized the applicability of this defense in certain contexts, we have also recognized that, in the century since *Southwestern Bell* was decided, "[t]he 'invasion of management' prohibition . . . has waned." *PNM Elec. Servs. v. N.M. Pub. Util. Comm'n* (*PNM Electric*), 1998-NMSC-017, ¶ 21, 125 N.M. 302, 961 P.2d 147. We now

understand that regulatory commissions have "substantial latitude in protecting the public" and "that commissions are generally empowered to act in areas seemingly reserved to management prerogative where the regulated action is 'impressed with the public interest.'" *Id*. (quoting *Pub. Serv. Co. of Okla. v. State ex rel. Corp. Comm'n ex rel. Loving*, 1996 OK 43, ¶ 25, 918 P.2d 733). Thus, in *PNM Electric*, we affirmed a New Mexico Public Utility Commission order rejecting a utility's application to provide nonutility services to its customers. 1998-NMSC-017, ¶¶ 2-9. Although we acknowledged that the Commission's authority to insert itself into the internal affairs of a utility is limited, *id*. ¶ 21, we also noted that the Commission had found that the nonutility services could have affected the utility's ability to provide its public services at fair, just, and reasonable rates. *Id*. ¶¶ 7, 17-18. We therefore concluded that the Commission did not exceed its authority by rejecting the utility's application and instead suggesting that the utility could provide the nonutility services through "unregulated corporate subsidiaries." *Id*. ¶¶ 18, 24.

**{24}** According to *PNM Electric*, when reviewing an order from the Commission, we do not separately consider whether the Commission invaded the business judgment or prerogative of a utility's management. *Id*. ¶ 22. Rather, the invasion of management defense has been incorporated into our standard of review, which provides that the Commission may not exceed its constitutional or statutory mandate, act arbitrarily or capriciously, or make a decision which is unsupported by substantial evidence. *Id*. (citing *Mountain States Tel. & Tel. Co. v. Wyoming Pub. Serv. Comm'n*, 745 P.2d 563, 568-70 (Wyo. 1987)). This is because the PUA only regulates activities that the Legislature has deemed to be of public concern, and thus activities that are not "'impressed with the public interest'" will fall outside the scope of the Commission's authority under the PUA. *PNM Electric*, 1998-NMSC-017, ¶¶ 21-22.

**{25}** For example, we have held that the Commission's jurisdiction does not extend to private contract or tort actions involving a utility. *Sw. Pub. Serv. Co. v. Artesia Alfalfa Growers' Ass'n*, 1960-NMSC-052, ¶¶ 18-23, 67 N.M. 108, 353 P.2d 62; *see also Summit Props., Inc. v. Pub. Serv. Co. of N.M.*, 2005-NMCA-090, ¶¶ 9-13, 138 N.M. 208, 118 P.3d 716. Likewise, we have held that the Commission may not place conditions on the provision of nonutility services in a certificate of public convenience and necessity absent findings that those services will affect the public interest. *Plains Elec. Generation & Transmission Coop., Inc. v. N.M. Pub. Util. Comm'n*, 1998-NMSC-038, ¶¶ 6, 23-26, 126 N.M. 152, 967 P.2d 827. Similarly, we have held that the Commission may not fix a debt ratio for a utility, as debt ratio is "strictly" a decision for the utility's internal management. *State Corp. Comm'n v. Mountain States Tel. & Tel. Co.*, 1954-NMSC-044, ¶ 54, 58 N.M. 260, 270 P.2d 685. But we have also held that the Commission may impute a capital structure to a utility for the purpose of ratemaking, as this is an important consideration in the setting of just and reasonable rates. *Zia Nat. Gas Co v. N.M. Pub. Util. Comm'n*, 2000-NMSC-011, ¶¶ 6-10, 128 N.M. 728, 998 P.2d 564; *see also Mountain States*, 1954-NMSC-044, ¶ 54 ("Debt ratio is strictly a matter for management, but its evalu[a]tion in fixing rates is an item for serious consideration by the rate-making body."). The Commission may not regulate private or internal matters of a utility because these matters fall outside the scope of the Commission's authority under the PUA. *See PNM Electric*, 1998-NMSC-017, ¶ 22. But the Commission's

regulatory authority does not necessarily end where a utility's business judgment begins.

**{26}** *PNM Electric* guides our disposition of SEC's arguments in this appeal. The Legislature has expressly recognized that the Commission may regulate a rural electric cooperative's rates and that the regulation of these rates is a matter of public concern. Section 62-8-7(H); *see also* Section 62-3-2(A) (extending coverage of the PUA to rural electric cooperatives because it is essential to the "public health, safety and welfare" of the state). Thus, the rates at issue were "impressed with public interest" so as to fall within the scope of the Commission's regulatory authority. *PNM Electric*, 1998-NMSC-017, ¶ 21. Therefore, consistent with *PNM Electric*, we do not consider whether the Commission invaded SEC's business judgment. Instead, we view the relevant questions as being whether the Commission's order is within the scope of the Commission's authority, whether the order is arbitrary and capricious, and whether the order is supported by substantial evidence. *Id.* ¶ 22. We resolve these questions in the remainder of this opinion.

## B.     The Legislature Authorized the Commission to Set Just and Reasonable Rates for Rural Electric Cooperatives

**{27}** As explained in the preceding section, we view SEC's assertion that the Commission invaded its internal management prerogative as a challenge to the scope of the Commission's authority under the PUA. SEC essentially contends that the Commission has no power to modify a rural electric cooperative's proposed rates but that the Commission is limited to either approving or denying the rates as proposed. Thus, in disposing of this argument, we consider whether the Commission exceeded its authority when it rejected SEC's proposed rates and instead ordered SEC to adopt rates that the Commission determined to be just and reasonable.

**{28}** We therefore construe Section 62-8-7(H) to ascertain the scope of the Commission's authority over a rural electric cooperative once the agency's ratemaking jurisdiction has been invoked. "When construing statutes, our guiding principle is to determine and give effect to legislative intent." *NMIEC*, 2007-NMSC-053, ¶ 20. When ascertaining legislative intent, we first look to the language of the statute and will give words their ordinary meaning unless the Legislature indicates a contrary meaning is intended. *ABCWUA*, 2010-NMSC-013, ¶ 52. We interpret statutory language in the context of the statute as a whole and in a way that facilitates the achievement of legislative purpose. *Baker v. Hedstrom*, 2013-NMSC-043, ¶ 15, 309 P.3d 1047. We also "consider the history and background of the statute" and "closely examine the overall structure of the statute we are interpreting, as well as the particular statute's function within a comprehensive legislative scheme." *State v. Rivera*, 2004-NMSC-001, ¶ 13, 134 N.M. 768, 82 P.3d 939. "Statutory language that is clear and unambiguous must be given effect." *ABCWUA*, 2010-NMSC-013, ¶ 52 (internal quotation marks and citation omitted). However, "where statutory language is doubtful, ambiguous, or an adherence to the literal use of the words would lead to injustice, absurdity or contradiction, we construe a statute according to its obvious spirit or reason." *Grisham v. Reeb*, 2021-NMSC-006, ¶ 12, 480 P.3d 852 (internal quotation marks and citation omitted).

**{29}**     As previously noted, the PUA generally grants the Commission plenary authority to regulate public utility rates. Section 62-6-4(A); *see also City of Albuquerque v. N.M. Pub. Serv. Comm'n*, 1993-NMSC-021, ¶ 25, 115 N.M. 521, 854 P.2d 348 ("Our holding that the Commission retains plenary authority over ratemaking recognizes that ratemaking is a matter of statewide rather than local concern."); *City of Albuquerque v. N.M. Pub. Regul. Comm'n*, 2003-NMSC-028, ¶ 8, 134 N.M. 472, 79 P.3d 297 ("[R]atemaking is a matter of statewide rather than local concern and the [Commission] retains plenary authority over ratemaking." (internal quotation marks and citation omitted)). However, the PUA limits the Commission's jurisdiction over a rural electric cooperative by placing conditions that must be satisfied before the Commission may regulate a cooperative's rates. Section 62-8-7(H) provides, in part, that rates proposed by a rural electric cooperative "shall become effective as proposed by the rural electric cooperative . . . without a hearing, except as provided in this subsection." The statute further provides:

> Upon the filing with the commission of a protest setting forth grounds for review of the proposed rates signed by the lesser of one percent of or twenty-five members of a customer rate class of the rural electric cooperative . . . and if the commission determines that there is just cause for reviewing the proposed rates on one or more of the grounds of the protest, the commission shall suspend the rates and conduct a hearing concerning the reasonableness of any proposed rates filed by a rural electric cooperative or a foreign distribution cooperative pursuant to Subsections C and D of this section. . . . The hearing and review shall be limited to the issues set forth in the protest and for which the commission may find just cause for the review, which issues shall be contained in the notice of hearing.

Section 62-8-7(H). Thus, the Commission's review of a rural electric cooperative's rates is conditioned on the filing of a sufficient number of member protests and a finding of just cause for review. *Id.* Once those conditions are satisfied, the Commission must conduct a hearing on the reasonableness of the proposed rates pursuant to Section 62-8-7(C) and (D), and the hearing is limited to the issues raised in the protests for which the Commission finds just cause for review. *Id.*

**{30}**     Section 62-8-7(C) and (D) are the general subsections of the PUA that grant the Commission authority to review and decide the reasonableness of any public utility's change in rates. As relevant to our analysis, Section 62-8-7(D) provides that, if the Commission finds a rate proposed by a utility "to be unjust, unreasonable or in any way in violation of law," then the Commission

> shall determine the just and reasonable rates to be charged or applied by the utility for the service in question and shall fix the rates by order to be served upon the utility[,] or the commission by its order shall direct the utility to file new rates . . . determined by the commission in its order to be just and reasonable.

**{31}** By the plain language of Section 62-8-7(D) and (H), once the Commission's jurisdiction is invoked, the Commission has authority *and mandate* to determine whether a cooperative's proposed rates are just and reasonable. If the Commission finds those rates are unreasonable, then the Commission may fix just and reasonable rates for that cooperative. The statutory language does not suggest that the Commission's authority in a Section 62-8-7(H) proceeding is limited to approving or rejecting the rates as proposed by a cooperative.

**{32}** SEC emphasizes the language in Section 62-8-7(H), which states that the Commission is required to "conduct a hearing concerning the reasonableness of any proposed rates filed by a rural electric cooperative." SEC reasons that this language expresses an intent to limit the Commission's review only to determining the reasonableness of the rates as proposed. However, we note that the language in Section 62-8-7(H) regarding the Commission conducting a hearing on the reasonableness of a rural electric cooperative's proposed rates is similar to language in Section 62-8-7(C) regarding the Commission's review of the reasonableness of rates proposed by any public utility. *Compare* Section 62-8-7(H) ("[T]he commission shall . . . conduct a hearing concerning the reasonableness of any proposed rates filed by a rural electric cooperative . . . pursuant to Subsections C and D of this section."), *with* Section 62-8-7(C) ("[T]he commission may, upon complaint or upon its own initiative, except as otherwise provided by law, upon reasonable notice, enter upon a hearing concerning the reasonableness of the proposed rates."). In view of this similarity and Section 62-8-7(H)'s express incorporation of Section 62-8-7(C) and (D), we do not read Section 62-8-7(H) as expressing a legislative intent to limit the Commission's authority to fix a just and reasonable rate for a cooperative.

**{33}** SEC nevertheless argues that the differing treatment of rural electric cooperatives under the PUA reveals a legislative intent to limit the Commission's ratemaking powers. Unlike investor-owned utilities, the board of trustees of a rural electric cooperative is elected by the cooperative members, and thus the members have some amount of control over the decisions of the cooperative. *See* § 62-15-9(A) (providing that a rural electric cooperative will be managed by a board of trustees elected by the members of the cooperative). Section 62-3-2(A)(3) thus recognizes that "rural electric cooperatives are substantially different from investor-owned utilities, particularly relative to setting rates," and that "the costs to rural electric cooperatives and the public at large in complete government regulation of their rates is greatly disproportionate to the need and benefits of complete rate regulation and interferes with the setting of fair, just and reasonable rates to all utilities."

**{34}** While we acknowledge the differing treatment of cooperatives under the PUA, we conclude that the Legislature has expressed an intent to distinguish rural electric cooperatives from investor-owned utilities only with respect to the procedures involved in the setting of rates. *See Tri-State Generation & Transmission Ass'n, Inc. v. N.M. Pub. Regul. Comm'n*, 2015-NMSC-013, ¶¶ 14-18, 347 P.3d 274 (explaining that the PUA distinguishes between cooperatives and investor-owned public utilities with respect to invocation of the Commission's jurisdiction). The Legislature has not distinguished between rural electric cooperatives and other public utilities with respect to the

substance or nature of the Commission's ratemaking powers. *See id.* ¶ 9 (concluding in a similar context that the Commission has plenary authority to set a generation and transmission cooperative's rates under Section 62-6-4(D) once the Commission's jurisdiction is invoked).

**{35}** Section 62-3-2(A)(3) states that the Legislature's purpose in extending coverage of the PUA to rural electric cooperatives is, in part, "to provide *procedures* for setting rates of rural electric cooperatives different from and more limited than those for setting rates of investor-owned utilities." (Emphasis added.) Further, the Legislature has stated that its purpose in regulating rural electric cooperatives is, in part, "to establish a system which will more adequately provide for the development and extension of reasonable and proper utility services at fair, just and reasonable rates." Section 62-3-2(A)(4). This language is similar to the Legislature's statement of purpose for regulating other public utilities. *See, e.g.*, NMSA 1978, § 62-3-1(B) (2008) ("It is the declared policy of the state that the public interest, the interest of consumers and the interest of investors require the regulation and supervision of public utilities to the end that reasonable and proper services shall be available at fair, just and reasonable rates."). Because the Legislature has identified a similar purpose for regulating both the rates of rural electric cooperatives and other public utilities, we conclude the Legislature has not expressed an intent to limit the Commission's powers to fix a just and reasonable rate in a Section 62-8-7(H) ratemaking proceeding.

**{36}** The legislative history of Section 62-8-7(H) confirms that the Legislature intended to distinguish between rural electric cooperatives and other Commission-regulated utilities only with respect to the procedures relating to the Commission's review of rates. It otherwise intended to treat rural electric cooperatives and public utilities equally with respect to the Commission's power to determine the just and reasonable rates to be charged by a utility. Originally, the PUA did not regulate rural electric cooperatives. *See Morningstar*, 1995-NMSC-062, ¶¶ 34-38 (discussing the history of regulating rural electric cooperatives under the PUA). Consequently, SEC was unable to invoke the Commission's regulatory powers when it sought to prevent another utility from extending service into SEC's service area. *Socorro Elec. Coop. v. Pub. Serv. Co.*, 1959-NMSC-105, ¶¶ 1-2, 22, 66 N.M. 343, 348 P.2d 88, *superseded by statute as stated in Edington v. N.M. Pub. Serv. Comm'n*, 1964-NMSC-248, ¶ 6, 74 N.M. 647, 397 P.2d 300 (citing 1961 PUA enactments "deleting the exclusion of rural electric cooperatives").

**{37}** In 1961, shortly after our opinion in *Socorro Electric*, the Legislature amended the PUA to include rural electric cooperatives as public utilities covered under the act. N.M. Laws 1961, ch. 89, § 2(F)(1); *Morningstar*, 1995-NMSC-062, ¶ 36. However, the Legislature only granted the Commission jurisdiction to regulate a rural electric cooperative's rates in territories where there was an overlapping certificate of public convenience and necessity granted to another utility "for the same class of service." N.M. Laws 1961, ch. 89, § 5. Rural electric cooperatives also were not required to service the public. *Morningstar*, 1995-NMSC-062, ¶ 36.

**{38}** In *Community Public Service Co. v. N.M. Public Service Commission*, 1966-NMSC-053, ¶ 9, 76 N.M. 314, 414 P.2d 675, we held that the distinctions between rural

electric cooperatives and other utilities under the 1961 version of the PUA violated equal protection. Unlike rural electric cooperatives, other regulated utilities had to serve the public, and their rates and services were fully regulated by the Commission; thus, these other utilities were placed at a decided disadvantage to rural electric cooperatives. *Id.* We could perceive no "rational basis for permitting an electric cooperative . . . entire freedom from control of its rates," while the other utilities were "required to charge for such service only such rates as the Commission approves." *Id.* ¶ 11.

**{39}** The year after our opinion in *Community Public*, "the legislature went back to the drawing board" and redrafted the RECA to provide that, in the event of a conflict between the RECA and the PUA, the PUA would control. *Morningstar*, 1995-NMSC-062, ¶ 37. The Legislature similarly explained that its intent in extending coverage of the PUA to rural electric cooperatives was to make cooperatives "subject to all the burdens and entitled to all the benefits which apply to public utilities generally." N.M. Laws 1967, ch. 96, § 9(A)(3). In 1985, the Legislature further amended the PUA to state that there was a rational basis supporting the adoption of different procedures for setting rural electric cooperative rates and limited the Commission's power to review the reasonableness of the rates on the filing of sufficient protests and a finding of just cause for review. N.M. Laws 1985, ch. 176, § 1(A)(3), § 2(F). We ascertain that, in making these amendments to the PUA and the RECA, the Legislature sought to rectify the constitutional infirmity identified in *Community Public* by distinguishing between rural electric cooperatives and other utilities only with respect to the procedures for setting rates.

**{40}** SEC additionally argues that the RECA, which grants broad powers to a cooperative's board of trustees to govern the cooperative's affairs, supports a legislative intent to limit the Commission's ratemaking powers over a cooperative. *See* § 62-15-9(G) ("The board of trustees may exercise all of the powers of a cooperative except such as are conferred upon the members by the [RECA] or its articles of incorporation or bylaws."). Contrary to SEC's arguments, we conclude that the general powers granted to a cooperative's board of trustees under the RECA do not constrain the Commission's authority under Section 62-8-7(H) to fix a just and reasonable rate. The PUA expressly provides, "Nothing contained in any other act governing the creation and operation of rural electric cooperatives which are public utilities, including [the RECA] shall be construed to conflict with any duty to which such a utility may be subject . . . under the [PUA], as now or hereafter amended." Section 62-3-2(C). The RECA has nearly identical language. Section 62-15-32 ("Nothing contained in the [RECA] shall be construed, however, to conflict with any duty to which a cooperative is subject . . . under [the PUA]."). Thus, even if the RECA reveals an intent to limit the Commission's ratemaking powers, the relevant standards of the PUA will control. *See Elec. Serv. in San Miguel Cnty. v. Pub. Serv. Comm'n of N.M.*, 1985-NMSC-038, ¶ 7, 102 N.M. 529, 697 P.2d 948 ("In the event of any conflict between the [PUA] and the [RECA], both Acts provide that the PUA will control.").

**{41}** For those reasons, we hold the Commission retains plenary authority to resolve the issues identified in a Section 62-8-7(H) proceeding and may fix just and reasonable

rates for a rural electric cooperative or order the cooperative to propose new rates that the Commission has determined to be just and reasonable. Section 62-8-7(D), (H). As SEC does not otherwise contend that the Commission's jurisdiction was improperly invoked under Section 62-8-7(H), we further conclude that the Commission did not exceed its statutory authority by rejecting the rates proposed by SEC and by ordering SEC to adopt rates that the Commission determined to be just and reasonable. We turn next to SEC's specific challenges to the Commission's ratemaking decisions.

**C.      The Commission's Decision to Reject SEC's Proposed Revenue Requirement Is Lawful, Reasonable, and Supported by Substantial Evidence**

**{42}**    We next consider whether the Commission's decision to reject SEC's proposed revenue requirement is unlawful, arbitrary and capricious, or unsupported by substantial evidence.

**1.      The Commission lawfully rejected SEC's proposed revenue increase**

**{43}**    SEC challenges as unlawful the Commission's decision to deny its proposed revenue requirement, arguing that the Commission attempted to set financial objectives for SEC by denying a revenue increase. As we have stated herein, we reaffirm that the Commission has limited authority to regulate the internal affairs of a cooperative, *PNM Electric*, 1998-NMSC-017, ¶¶ 21-22, but we also hold that the Commission may determine the just and reasonable rates to be charged by a cooperative in accordance with Section 62-8-7(C), (D), and (H). *See also* NMSA 1978, § 62-8-1 (1941) ("Every rate made, demanded or received by any public utility shall be just and reasonable."). On review, we conclude that the Commission did not set financial objectives for SEC by rejecting SEC's proposed revenue requirement. Rather, the Commission denied SEC's proposed rates because it determined that the rates were not just and reasonable and that SEC had not shown a need for increased revenue.

**{44}**    The just and reasonable standard of the PUA requires rates to be "neither unreasonably high so as to unjustly burden ratepayers with excessive rates nor unreasonably low so as to constitute a taking of property without just compensation or a violation of due process by preventing the utility from earning a reasonable rate of return on its investment." *PNM Gas*, 2000-NMSC-012, ¶ 8. We have explained that, to set a just and reasonable rate, the Commission must balance "the public interest, the interests of consumers, and the interests of investors in public utility companies." *N.M. Att'y Gen. v. N.M. Pub. Regul. Comm'n*, 2013-NMSC-042, ¶ 20, 309 P.3d 89. In the context of a rural electric cooperative, the interests to be balanced are those of the public, the cooperative's members or customers, and its board of trustees. *Cf.* § 62-3-2(A)(3) ("[R]ural electric cooperatives are nonprofit membership corporations whose members have direct control over the cooperative's rates through an elected board of trustees. Generally, consumers of the cooperative's power are members.").

**{45}**    We conclude that the Commission's decision to deny SEC's proposed revenue requirement is consistent with the Commission's duty to set just and reasonable rates.

Essentially, the Commission determined that SEC was not entitled to a revenue increase that would attain all SEC's financial objectives because those objectives were outweighed by the interests of the public and of SEC's members and customers. SEC has not shown that this decision resulted in rates that exceed the "'zone of reasonableness' in which rates are neither ratepayer extortion nor utility confiscation." *PNM*, 2019-NMSC-012, ¶ 10 (citation omitted). SEC also has not shown that its financial objectives constituted actual or necessary expenses prudently incurred for the benefit of ratepayers, such that the Commission would have been required to include the objectives in SEC's rates. *See PNM Gas*, 2000-NMSC-012, ¶ 68 (explaining that the Commission "has an obligation to allow a utility expenses that are necessary in providing utility service, that benefit ratepayers, and that are prudently incurred" (internal quotation marks and citation omitted)); Section 62-15-20 (providing that member patronage credits are to be paid from revenues "in excess of the amount thereof necessary" to defray expenses and meet other obligations of the cooperative). The Commission also did not direct SEC to condition support for any one of its financial objectives on a revenue increase or prioritize its financial objectives in any particular way. Rather, the Commission limited itself to issues relating to the setting of rates and did not address matters not "impressed with public interest." *PNM Electric*, 1998-NMSC-017, ¶ 21 (internal quotation marks and citation omitted). We therefore defer to the Commission's discretion and expertise in concluding that increased revenues would not benefit SEC's members or ratepayers. *See PNM Gas*, 2000-NMSC-012, ¶ 9 (noting that, in meeting its obligation to ensure that every rate is just and reasonable, "'the Commission is vested with considerable discretion'" (brackets and citation omitted)).

## 2. The Commission did not act arbitrarily or capriciously or without substantial evidence in denying the revenue increase

{46}     SEC also argues that the Commission's rejection of its proposed revenue requirement is arbitrary and capricious. SEC contends that the Commission acted unreasonably in relying on OTIER as a method to calculate SEC's revenue requirement. SEC asserts that the Commission instead should have used the cash-margins method relied on by its Board of Trustees.

{47}     However, we have recognized that "[t]he Commission is not bound to the use of any single formula or combination of formulae in determining rates. . . . It is the result reached, not the method employed, which is controlling." *PNM*, 2019-NMSC-012, ¶ 10 (brackets, internal quotation marks, and citation omitted). The Commission has broad discretion and authority in setting rates, and this "discretion extends to determining the appropriate method for establishing just and reasonable rates." *N.M. Att'y Gen.*, 2013-NMSC-042, ¶ 33. The Commission was not required to rely on the cash-margins method advocated by SEC.

{48}     We also recognize that "the Commission is not free to disregard its own rules and prior ratemaking decisions or to change its position without good cause and prior notice to the affected parties." *PNM*, 2019-NMSC-012, ¶ 11 (internal quotation marks and citation omitted). Traditionally, in setting the rates of an investor-owned utility, the Commission has used a rate of return methodology, in which the utility's revenue

requirement is calculated by considering the anticipated costs of operation, a rate base which reflects the current value of the utility's property and investments, and a reasonable rate of return on the utility's investment. *PNM Gas*, 2000-NMSC-012, ¶ 6; *Hobbs Gas Co. v. N.M. Pub. Serv. Comm'n*, 1980-NMSC-005, ¶¶ 5-6, 94 N.M. 731, 616 P.2d 1116. However, the Commission has found the rate of return methodology to be a less useful measure of a rural electric cooperative's revenue needs. Rural electric cooperatives typically have less equity capital than investor-owned utilities, which undermines the rate of return method where equity is a primary consideration. The Commission has therefore relied on a debt service coverage ratio to determine whether rural electric cooperatives are in need of a revenue increase. *See, e.g.*, *In re Jemez Mountains Elec. Coop.'s Advice Notice No. 61,* Case No. 12-00258-UT, Recommended Decision, 13-15, 26-29 (N.M. Pub. Regul. Comm'n May 20, 2013) (discussing Commission decisions approving revenue requirements from rural electric cooperatives using a debt service coverage approach and recommending approval of a stipulated revenue requirement relying on a debt service coverage approach). In the most recent ratemaking proceeding involving a rural electric cooperative, the Commission relied on the OTIER debt service coverage ratio. *In re Filing of Proposed New Rates by Kit Carson Elec. Coop., Inc.*, Case No. 15-00375-UT, Recommended Decision, 75-79 (N.M. Pub. Regul. Comm'n Oct. 31, 2016).

**{49}**  In the current proceedings on appeal, SEC received notice that the Commission had previously relied on a debt service coverage ratio to determine the revenue requirement for a rural electric cooperative. The Commission also explained why OTIER was an appropriate measure of SEC's revenue requirement considering the specific characteristics of SEC and the available evidence in the record. We also emphasize the Commission did not rely solely on OTIER to decide that SEC had not shown the need for a revenue increase because SEC's CEO admitted that SEC would be financially stable and able to continue serving customers even without the proposed revenue increase, and SEC's financial information and expert testimony confirmed the factual basis for this admission. The Commission's consistent application of an OTIER methodology supported by the Commission's review of financial data to determine SEC's revenue needs is neither arbitrary nor capricious.

**{50}**  The Commission's conclusions about SEC's need for the revenue increase are further supported by exhibits and expert testimony in the record as we have more fully summarized herein by factual background. We conclude that the Commission's decision to deny SEC's proposed revenue increase is supported by substantial evidence.

**D.    The Commission's Revenue Reallocation and Rate Design Decisions Are Lawful, Reasonable, and Supported by Substantial Evidence**

**{51}**  We next consider whether the Commission's rejection of SEC's proposed allocation of revenue collections among its customer classes and SEC's proposed rate design was unlawful, arbitrary and capricious, or unsupported by substantial evidence.

**1. The Commission's reallocation and design decisions are lawful**

**{52}** Similar to SEC's other arguments, SEC suggests that the Commission's order to reallocate revenues and redesign SEC's rates is unlawful because the Commission had no power to direct SEC to adopt a different allocation or design but was limited to approving or denying the allocation and design as proposed. However, revenue allocation and rate design are public matters, § 62-3-2(A)(4) ("[T]he rural electric cooperative which is a public utility is subject to reasonable burdens and entitled to reasonable benefits which apply to public utilities generally, to insure . . . reasonable and proper utility services at fair, just and reasonable rates."), that clearly fall within the issues identified in the Commission's notice of hearing. Having concluded the Commission had authority to set just and reasonable rates for SEC pursuant to Section 62-8-7(D) and (H), we also conclude the Commission's reallocation and rate design decisions are therefore lawful.

**2. The Commission's reallocation and design decisions are not arbitrary and capricious and are supported by substantial evidence**

**{53}** SEC has not shown the Commission's decisions on revenue reallocation and rate design are arbitrary or capricious. For example, SEC asserts that the Commission acted unreasonably when it departed from the allocations recommended by the Cost of Service Study procured by SEC and the allocations proposed by SEC. However, we have specifically "discouraged the use of cost of service as a sole criterion in designing rates." *PNM Gas*, 2000-NMSC-012, ¶ 100 (citing *Mountain States Tel. & Tel. Co. v. N.M. State Corp. Comm'n*, 1977-NMSC-032, ¶¶ 73-74, 90 N.M. 325, 563 P.2d 588). Moreover, the Commission has not been "required to rely on any one rate-design method." *N.M. Att'y Gen. v. N.M. State Corp. Comm'n*, 1996-NMSC-002, ¶ 33, 121 N.M. 156, 909 P.2d 716. Rather, this Court has "acknowledge[d] that the Commission has considerable discretion in the area of rate design," *PNM Gas*, 2000-NMSC-012, ¶ 99, and may consider principles such as unity or full cost of service contribution, continuity, stability, and gradualism in avoidance of rate shock. *Id.* ¶ 102; *Mountain States*, 1977-NMSC-032, ¶ 73.

**{54}** Although the Hearing Examiner based her recommendations on the figures and analysis in the Cost of Service Study procured by SEC, the Hearing Examiner recommended that the Commission depart from the proposed allocations. For example, the Hearing Examiner recommended SEC adopt rate increases for the Residential and Irrigation classes that were less significant than the increases proposed by SEC, that SEC not change rates for the Lighting class, and that SEC implement slight decreases in rates for the Load Management and Large Commercial classes. The Hearing Examiner explained that these adjustments were made to support a more gradual movement towards each class contributing to its full cost of service. The Hearing Examiner's reasoning and recommendations are consistent with the rate design principles used by the Commission and accepted by this Court. *PNM Gas*, 2000-NMSC-012, ¶ 102. SEC has not shown that the Hearing Examiner's application of these principles to its rates is arbitrary or capricious.

**{55}** SEC also argues that the Commission's reallocation and design decisions are not based on substantial evidence. But SEC does not attack the Commission's findings in this regard with particularity. *See* Rule 12-318(A)(4) NMRA ("A contention that a . . . finding of fact is not supported by substantial evidence shall be deemed waived unless the argument identifies with particularity the fact or facts that are not supported by substantial evidence."). Instead, SEC focuses on repeating the evidence supporting its proposed rates. However, "the issue on appeal is not whether there was sufficient evidence to support a contrary result but, rather, whether the evidence supports the findings made by the [Commission]." *ABCWUA*, 2010-NMSC-013, ¶ 89.

**{56}** We conclude that SEC has waived its substantial evidence challenge to the findings supporting the Commission's reallocation and design decisions. Nevertheless, to the extent that SEC generally attacks the Commission's reallocation and design decisions, we conclude that the Commission's order is based on substantial evidence. The reasons cited by the Hearing Examiner for the recommended reallocation of revenues among the customer classes, rate structure redesign, and denial of certain customer and minimum use charges are supported by testimony and exhibits in the record as a whole. We therefore defer to the Commission's expertise and discretion in reallocating revenues and designing SEC's rates. *See Hobbs*, 1980-NMSC-005, ¶ 4.

### E. SEC's Remaining Issues Fail to Demonstrate Other Grounds for Vacating the Order

**{57}** SEC asserts there were several "inconsistenc[ies]" in the Commission's order that the Commission "refused to clarify." For example, SEC asserts that the Commission has not clarified whether SEC may split its Small Commercial and Residential customers into two customer classes or whether its Lighting rates "are to remain unchanged from SEC's proposal or SEC's existing rates." The Commission responds that the asserted inconsistencies are clarified on careful reading of the Hearing Examiner's Recommended Decision and the Commission's final order.

**{58}** We agree that the asserted inconsistencies are clarified on careful reading of the Recommended Decision and final order. Irrespective of this dispute, SEC shoulders the burden in this appeal of showing that the order is unlawful or unreasonable because it is arbitrary and capricious, not supported by substantial evidence, outside of the scope of the Commission's authority, or otherwise contrary to law. *PNM*, 2019-NMSC-012, ¶ 12. Because the asserted inconsistencies do not approach this standard, they provide no basis for annulling and vacating the Commission's order.

**{59}** Finally, SEC asserts the Commission's decision is unlawful because the Commission lacked authority to order SEC to initiate the process of offering an economic development rate under NMSA 1978, Section 62-6-26 (2015). SEC similarly challenges as unlawful a part of the Commission's order that addresses installation of replacement lights for its Lighting class customers. However, SEC did not clearly raise these issues in its Brief in Chief and only passingly mentions these issues in its Reply Brief. "It is well established that we will not address issues raised for the first time in the reply brief." *ABCWUA*, 2010-NMSC-013, ¶ 59 (internal quotation marks and citation

omitted); *see also* Rule 12-318(C) (providing that the reply brief "shall reply only to arguments or authorities presented in the answer brief"). Further, we will not review inadequately briefed issues. *See Citizens for Fair Rates & the Env't v. N.M. Pub. Regul. Comm'n*, 2022-NMSC-010, ¶¶ 29-30, 503 P.3d 1138 (declining to rule on an inadequately briefed issue on appeal from a Commission order). For these reasons, we do not reach these issues.

## V.    CONCLUSION

**{60}**    We conclude that the Commission properly exercised its authority to resolve the issues identified in this Section 62-8-7(H) proceeding and to fix just and reasonable rates for SEC. SEC has not shown that the Commission's order is unlawful or unreasonable. Therefore, we affirm the Commission's order.

**{61}    IT IS SO ORDERED.**

**JULIE J. VARGAS, Justice**

**WE CONCUR:**

**DAVID K. THOMSON, Chief Justice**

**MICHAEL E. VIGIL, Justice**

**C. SHANNON BACON, Justice**

**BRIANA H. ZAMORA, Justice**